## STATE MANAGEMENT ASSOCIATION OF CONNECTICUT, INC., ET AL. *v.* WILLIAM A. O'NEILL ET AL.

SUPERIOR COURT     JUDICIAL DISTRICT OF     FILE NO. 267363
HARTFORD-NEW BRITAIN AT HARTFORD

Memorandum filed May 20, 1986

*Eugene N. Sosnoff,* for the plaintiffs.

*Charles A. Overend,* assistant attorney general, for the defendants.

---

\* The judgment for the defendants herein is on appeal to the Appellate Court.

Satter, J. The plaintiffs are state employees, who appear individually and as members and on behalf of members and officers of the State Management Association of Connecticut, Inc. (SMAC), a union of management level employees, to challenge the constitutionality of § 5-270 (g) of the General Statutes. The section defines a "managerial employee" by his principal functions.[1] Pursuant to § 5-270 (b), such managerial employees are not "employees" within the meaning of the Collective Bargaining for State Employees Act (CBSEA); General Statutes § 5-270 et seq.; and thus are denied the rights afforded to "employees" by § 5-271, under that act.

By way of background, that act, without reference to managerial employees, was enacted in 1975, giving state employees for the first time the right to bargain collectively. Immediately a number of unions active in the field of public employment petitioned the state labor relations board (board) to be certified as majority representatives for specified units of state employees. The board eventually established, by regulation, eleven bar-

[1] General Statutes § 5-270 (g) provides: " 'Managerial employee' means (1) any individual in a position in which the principal functions are characterized by not fewer than two of the following: (A) Responsibility for direction of a subunit or facility of a major division of an agency or assignment to an agency head's staff; (B) development, implementation and evaluation of goals and objectives consistent with agency mission and policy; (C) participation in the formulation of agency policy; (D) a major role in the administration of collective bargaining agreements or major personnel decisions, or both, including staffing, hiring, firing, evaluation, promotion and training of employees; or (2) department of correction employees at the level of lieutenant or above. The number of managerial employees in the state executive and judicial branches shall not exceed four per cent of the total number of permanent full-time employees in each branch; the number of managerial employees in each constituent unit of the system of higher education shall not exceed seven per cent of the total number of permanent full-time employees in each unit."

Effective July 1, 1986, No. 86-411 of the 1986 Public Acts amends this subsection by repealing the provision that imposes a 4 percent limit in the number of managerial employees in the state executive and judicial branches.

gaining units. The state insisted that certain employees were managers and should be excluded from the units. The unions, desirous of being certified as quickly as possible as bargaining representatives, did not oppose the state. Four years later those managers were still not represented nor allowed to participate in the collective bargaining process. They formed SMAC and petitioned the board for recognition. Over the opposition of the state, the board ruled that managerial employees were entitled, under the then existing statute, to be represented by a union and to bargain collectively. An election by managerial employees was held; SMAC won and on May 14, 1981, the board certified SMAC as the collective bargaining representative. Less than two months later the General Assembly passed Public Acts 1981, No. 81-457, which included § 12, now codified as § 5-270 (g).

While subsection (g) of § 5-270, when read with subsection (b), deprives managerial employees of a whole gamut of rights under CBSEA, including the right to form and to join a union, the only rights the plaintiffs in this suit have proven that the state has denied them are the right to have SMAC recognized as their bargaining agent and the right to engage in collective bargaining.

The plaintiffs point out that while they are denied those rights, "supervisory employees," defined by § 5-270 (f), are not, and that there is no rational way to distinguish the two classes of employees.

Thus, the plaintiffs contend that subsection (g) of § 5-270, and subsection (b), to the extent it incorporates subsection (g): (1) deprive the plaintiffs and members of their union of equal protection of the law in violation of article first, §§ 1 and 20, of the state constitution and in violation of the fourteenth amendment to the United States constitution; (2) are vague and ambiguous in violation of the due process clause of the four-

teenth amendment to the United States constitution; and (3) violate the federal civil rights statute, 42 U.S.C. § 1983, by reason of abridging rights guaranteed by the fourteenth amendment.

The plaintiffs seek a judgment declaring subsection (g) of § 5-270 and subsection (b), to the extent it incorporates subsection (g), unconstitutional, an order nullifying actions of the state, its officials and agencies taken pursuant to those statutes, and an injunction restraining the state, its officials and agencies from taking any action which is based on authority of those statutes.

### PRELIMINARY

The court has a "judicial duty" to decide the constitutionality of the statute here challenged. *Horton* v. *Meskill,* 172 Conn. 615, 625, 376 A.2d 359 (1977). Moreover, the plaintiffs' action for a declaratory judgment and for a prospective injunction against constitutional violations is well adapted to the judicial determination of controversies concerning constitutional rights and the constitutionality of state laws. *Sentner* v. *Board of Trustees,* 184 Conn. 339, 344–45, 439 A.2d 1033 (1981); *Horton* v. *Meskill,* supra, 626.

The defendants urge this court not to decide the plaintiffs' claim for a declaratory judgment because the plaintiffs have not exhausted their administrative remedy by first seeking a declaratory ruling from the board under § 4-176 of the Uniform Administrative Procedure Act. Recognized exceptions to the exhaustion doctrine include, however, claims raising the constitutional propriety of an agency ruling; *Harwinton Drilling & Engineering Co.* v. *Public Utilities Control Authority,* 188 Conn. 90, 94, 448 A.2d 210 (1982); or the constitutionality of a statute governing agency action. *Friedson* v. *Westport,* 181 Conn. 230, 233, 435 A.2d 17 (1980). Here the plaintiffs challenge not the application by the board of § 5-270 (g) and (b), but the con-

stitutionality of this statute on its face. In *Caldor, Inc.* v. *Thornton,* 191 Conn. 336, 344, 464 A.2d 785 (1983), aff'd sub nom. *Estate of Thornton* v. *Caldor, Inc.,* 472 U.S. 703, 105 S. Ct. 2914, 86 L. Ed. 2d 557 (1985), the Supreme Court noted that "[w]hether a statute is in conflict with the state constitution is the duty of the judiciary to determine. . . . The legislature cannot confer upon an administrative agency the power to adjudicate facial unconstitutionality without doing violence to the separation of powers doctrine." Thus, the defendants' argument of the exhaustion of administrative remedies is without merit in this case.

## EQUAL PROTECTION ISSUE

Although our courts are not required to interpret similar clauses in the state and federal constitutions the same way; see *Fasulo* v. *Arafeh,* 173 Conn. 473, 475, 378 A.2d 553 (1977); Berdon, "Protecting Liberty and Property under the Connecticut and Federal Constitutions: The Due Process Clauses," 15 Conn. L. Rev. 41 (1982); there is no reason in this case for not giving the equal protection clauses in article first, § 20, of the Connecticut constitution and in the fourteenth amendment to the United States constitution like meanings and for not imposing similar constitutional limitations. *Frazier* v. *Manson,* 176 Conn. 638, 645, 410 A.2d 475 (1979); *Kellems* v. *Brown,* 163 Conn. 478, 485, 313 A.2d 53 (1972), appeal dismissed, 409 U.S. 1099, 93 S. Ct. 911, 34 L. Ed. 2d 678 (1973).

The analysis of the constitutional doctrine of equal protection must start with a determination of whether a legislative classification is inherently suspect, or whether the legislation impinges upon a fundamental right. Where the legislation creates a suspect classification or impinges upon a fundamental right, it is subject to strict scrutiny and must be struck down unless justified by a compelling state interest. *Dunn* v. *Blumstein,* 405 U.S. 330, 335, 92 S. Ct. 995, 31 L. Ed. 2d 274

(1972); *Laden* v. *Warden,* 169 Conn. 540, 542, 363 A.2d 1063 (1975). Where a statute does not involve suspect classifications or fundamental rights, it will survive constitutional challenge if the distinction created is founded on a rational basis. *McGinnis* v. *Royster,* 410 U.S. 263, 270, 93 S. Ct. 1055, 35 L. Ed. 2d 282 (1973); *Laden* v. *Warden,* supra.

Among classifications which have been identified as inherently suspect are those based on alienage, national origin, race and sex. *Frontiero* v. *Richardson,* 411 U.S. 677, 688, 93 S. Ct. 1764, 36 L. Ed. 2d 583 (1973). A classification based on employment relationship, as in this case, is clearly distinguishable. *Cardo* v. *Lakeland Central School District,* 592 F. Sup. 765, 771 (S.D.N.Y. 1984).

The plaintiffs do, however, assert that the right to bargain collectively is a fundamental right, relying as authority upon *NLRB* v. *Jones & Laughlin Steel Corporation,* 301 U.S. 1, 33, 57 S. Ct. 615, 81 L. Ed. 893 (1937). In that case the United States Supreme Court was referring to a "fundamental right" created by the National Labor Relations Act and not by the United States constitution.

The key to determining whether a right is fundamental for purposes of equal protection analysis is whether that right is explicitly or implicitly guaranteed by the constitution. *San Antonio School District* v. *Rodriguez,* 411 U.S. 1, 33–34, 93 S. Ct. 1278, 36 L. Ed. 2d 16, reh. denied, 411 U.S. 959, 93 S. Ct. 1919, 36 L. Ed. 2d 418 (1973). Among such rights are the rights to vote, travel, procreate and speak freely. *Frazier* v. *Manson,* supra, 646. They do not include the right to bargain collectively and to be protected by, and receive the benefits of, a collective bargaining agreement.

In *Cardo* v. *Lakeland Central School District,* supra, a per diem teacher brought suit against the school dis-

trict and the teachers union, on the ground that he was denied his constitutional right of equal protection by being excluded from protection under a collective bargaining agreement. In holding that the plaintiff had not claimed a fundamental right, the court said: "The right to collectively bargain and to receive the benefits of collective bargaining are not among the rights afforded explicit protection under our federal constitution. Nor is there any basis for finding that they are implicitly so protected or necessary to protect all other rights." Id., 770. Cases to the same effect are *Hanover Township Federation of Teachers Local 1954 (AFL-CIO)* v. *Hanover Community School Corporation,* 457 F.2d 456, 461 n.13 (7th Cir. 1972), citing *Indianapolis Education Assn.* v. *Lewallen,* 72 LRRM 2071, 2072 (7th Cir. 1969); *Atkins* v. *Charlotte,* 296 F. Sup. 1068, 1077 (W.D.N.C. 1969).

Nor does this court find that the statute here being challenged involves rights that are significant, though not fundamental, or classifications that are sensitive, though not suspect, so that they demand some intermediate standard of review. *Keogh* v. *Bridgeport,* 187 Conn. 53, 67, 444 A.2d 225 (1982); *Eielson* v. *Parker,* 179 Conn. 552, 564, 427 A.2d 814 (1980).

Thus, the proper standard for assessing the plaintiffs' equal protection claim is the rational basis test. Under this test a statute will stand if the classification it creates bears a reasonable relation to a legitimate state interest. *G. D. Searle & Co.* v. *Cohn,* 455 U.S. 404, 408, 102 S. Ct. 1137, 71 L. Ed. 2d 250 (1982); *Keogh* v. *Bridgeport,* supra, 66. " 'It is established that a distinction in legislation is not arbitrary, if any state of facts reasonably can be conceived that will sustain it . . . . It makes no difference that the facts may be disputed or their effect opposed by argument and opinions of serious strength.' " *Rast* v. *Van Deman & Lewis Co.,* 240 U.S. 342, 357, 36 S. Ct. 370, 60 L. Ed. 679

(1916), quoted with approval in *United Illuminating Co.* v. *New Haven,* 179 Conn. 627, 642, 427 A.2d 830, appeal dismissed, 449 U.S. 801, 101 S. Ct. 45, 66 L. Ed. 2d 5 (1980); *McGowan* v. *Maryland,* 366 U.S. 420, 426, 81 S. Ct. 1101, 6 L. Ed. 2d 393 (1961).

"When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern. . . . The calculus of effects, the manner in which a particular law reverberates in a society, is a legislative and not a judicial responsibility." *Eielson* v. *Parker,* supra, 565.

Early experience under the National Labor Relations Act (NLRA) revealed the need to exclude supervisory personnel from membership in labor unions engaged in collective bargaining against companies, in order to maintain successful and harmonious labor relations. 2 House Miscellaneous Reports, No. 245 (1947); 1 Leg. Hist. L.M.R.A. 1947 (1985) pp. 291, 299. This led to the adoption of a provision in the Taft-Hartley Act denying to supervisors rights under the NLRA. The provision was upheld against fourteenth amendment attacks in *NLRB* v. *Edward G. Budd Mfg. Co.,* 169 F.2d 571, 578 (6th Cir. 1948), on the grounds that treating supervisors as "a part of management, was based upon substantial and real considerations, and was not an arbitrary or unjustifiable classification."

When collective bargaining was accorded to public employees, the reasons for excluding supervisors under the NLRA, in order to preserve the management team, were recognized to apply with equal force to the public sector. The underlying rationale was "to maintain a stable and effective labor relations environment by ensuring employers the undivided loyalty of those acting directly in their behalf . . . ." Rains, "Collective Bargaining in the Public Sector and the Need for Exclusion of Supervisory Personnel," 23 Labor L.J. 275, 279 (1972).

In *Matter of Shelofsky* v. *Helsby,* 32 N.Y.2d 54, 295 N.E.2d 774, 343 N.Y.S.2d 98 (1973), the New York Court of Appeals held that the New York Civil Service Law barring managers from membership in public employee bargaining organizations did not deprive those employees of freedom of association or equal protection of the laws. Managers are defined in the statute as those persons who formulate policy, conduct collective bargaining negotiations and perform a major role in the administration of collective bargaining agreements or a major role in personnel administration. The court noted: "The need to have a responsible cadre of management personnel to formulate policy and to handle labor relations is equally applicable to the State in its capacity as an employer." Id., 58.

In fact, the need to identify managers and to distinguish them from other employees is even greater in public employment where the employer is not an owner and management is not associated with employing owners. See comment, "Collective Bargaining for Connecticut State Employees: A Look at the Statute and Relevant Decisions," 9 Conn. L. Rev. 654, 664 (1977).

While conceding that there may be a rational basis for distinguishing managers from rank and file employees, the plaintiffs argue that there is no rational basis for distinguishing supervisory employees, defined in § 5-270 (f)[2] and granted collective bargaining rights under the CBSEA, from managerial employees, defined in § 5-270 (g) and denied such rights under § 5-270 (b).

---

[2] General Statutes § 5-270 (f) provides: " 'Supervisory employee' means any individual in a position in which the principal functions are characterized by not fewer than two of the following: (1) Performing such management control duties as scheduling, assigning, overseeing and reviewing the work of subordinate employees; (2) performing such duties as are distinct and dissimilar from those performed by the employees supervised; (3) exercising judgment in adjusting grievances, applying other established personnel policies and procedures and in enforcing the provisions of a collective bargaining agreement; and (4) establishing or participating in the estab-

This court finds that subsection (f) and subsection (g) of § 5-270 clearly differentiate between the two types of employees. Supervisors supervise the work of subordinates; managers head an agency subunit or facility. Supervisors apply agency policies; managers formulate those policies. Supervisors enforce collective bargaining agreements; managers play a major role in administering them. Supervisors establish and implement employee performance standards; managers decide major personnel decisions. In short, supervisors are equivalent to foremen and lower management, as managers are to middle and upper management.

The same rationale that justifies separating supervisors from rank and file employees has even greater weight in separating supervisors from managers, in order to ensure the state the undivided loyalty of its top level personnel acting on its behalf. Rains, supra, 275.

This court finds that the classification of managerial employees under § 5-270 (g) and the denial to them of collective bargaining rights under CBSEA bears a rational relationship to a legitimate state end and thus survives challenge on equal protection grounds.

### DUE PROCESS ISSUE

The plaintiffs allege in their second count that § 5-270 (g) violates the due process clause of the fourteenth amendment because it is so vague and ambiguous as to render it unenforceable and grossly susceptible to subjective and inconsistent interpretations and appli-

lishment of performance standards for subordinate employees and taking corrective measures to implement those standards, provided in connection with any of the foregoing the exercise of such authority is not merely of a routine or clerical nature, but requires the use of independent judgment, and such individuals shall be employees within the meaning of subsection (b) of this section. The above criteria for supervisory positions shall not necessarily apply to police or fire departments."

cations. Specifically, the plaintiffs complain that the definitions of supervisory employees in § 5-270 (f) and of managerial employees in § 5-270 (g) are a "semantic bog" and that personnel can fall into one class or the other at the whim of an administrator.[3]

Due process requires that a statute inform a person of ordinary intelligence what is permitted or prohibited. "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally* v. *General Construction Co.,* 269 U.S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 2d 322 (1926), quoted with approval in *McKinney* v. *Coventry,* 176 Conn. 613, 617, 410 A.2d 453 (1979). Civil statutes are, however, held to a lesser degree of specificity than criminal statutes. *Seals* v. *Hickey,* 186 Conn. 337, 343, 441 A.2d 604 (1982).

The plaintiffs' labor relations expert, Professor Getman of Yale University, testified at the trial that as difficult as it was to distinguish between supervisors and regular employees, § 5-270 (f) and (g) made it virtually impossible to distinguish between supervisory and managerial employees. The state's expert, Roy Dion, who is engaged exclusively in Connecticut public employee classifications, testified that he was able to interpret and apply statutory definitions of supervisor and manager, although he conceded that it was a judgment call to determine the two "principal functions" of some employees.

"A statute is not void for vagueness, however, simply because it may be open to two possible construc-

---

[3] The plaintiffs also complain that the 4 percent limitation in the number of managerial employees in § 5-270 (g) is arbitrary and violates due process. This provision has been repealed by the 1986 legislature, effective July 1, 1986; Public Acts 1986, No. 86-411, § 5; and so the issue is, for all intents and purposes, moot.

tions . . . or 'merely because the imagination can conjure up hypothetical situations in which the meaning of some terms may be in question.' " *McKinney* v. *Coventry,* supra, 619.

The plaintiffs also presented evidence at the trial that a number of state employees felt they filled both supervisory and managerial roles. The doubt left in this court's mind was whether or not they were identifying their principal functions. It is not unusual for higher level employees to perform some of the functions of lower level employees. The important criterion here is that, whatever type of supervisory jobs employees may do, if their main responsibilities are any two of the functions listed in § 5-270 (g)—heading an agency subunit or facility, developing agency goals and objectives, formulating agency policy, and playing a major role in administration of collective bargaining agreements, or making major personnel decisions—they are managers within the meaning of § 5-270 (g).

Pennsylvania excludes "management level employees" from its state employee labor relations act. 43 Pa. Stat. Ann., tit. 43 § 1101.301 (2) and (16) (Purdon Sup. 1985). In *In the Matter of the Employees of Carlynton School District,* 31 Pa. Commw. 631, 636, 377 A.2d 1033 (1977), the court held that as long as an employee performed some of the management functions, he was properly placed within the statutory definition of a management level employee.

In a case entitled *In the Matter of State of Connecticut, Executive Branch* -and- *New England Health Care Employees Union, District 1199,* Case No. SEE-7431, Decision No. 2284, February 29, 1984, the board had to determine whether certain job classifications and positions in a department of mental retardation care unit were managerial within the meaning of the statute. The board found it could not make a decision as

to some positions because there had not been presented the organizational structure of the department as a whole so that it could determine the "principal functions" of the positions in question. It was able to decide, however, that an assistant director of residential program one met two of the criteria of § 5-270 (g) and thus qualified as managerial and that nurse supervisors possibly met only one of the criteria and did not so qualify. The case illustrates that the board can interpret and apply the statute.

This court finds the statute here under attack successfully repels a vagueness challenge because it distinguishes between supervisory and managerial employees with adequate clarity for the laws to be fairly administered. Whatever its lack of precision, that, in and of itself, is not offensive to the requirement of due process. *State* v. *Anonymous,* 179 Conn. 155, 164, 425 A.2d 939 (1979).

## FEDERAL CIVIL RIGHTS STATUTE ISSUE

The plaintiffs claim that their denial of the right to participate in collective bargaining under CBSEA violates § 1983 of Title 42 of the United States Code. That statute creates a right of action on behalf of anyone who, under color of law, has been deprived of any rights secured by the constitution and laws of the United States. Such a claim consists of two elements: (1) that the plaintiff has been deprived of a right secured by the United States constitution or a federal law; and (2) that the defendant deprived him of this right while acting under color of a state statute. *Flagg Bros., Inc.* v. *Brooks,* 436 U.S. 149, 156, 98 S. Ct. 1729, 56 L. Ed. 2d 185 (1978).

Here, the plaintiffs, having failed to prove denial of any constitutional rights, cannot prevail on their § 1983 claim.

## Conclusion

The plaintiffs have not met their heavy burden of establishing the unconstitutionality of subsections (g) and (b) of § 5-270. *McKinney* v. *Coventry,* supra, 621–22.

Judgment may enter for the defendants without costs.