THE CITY OF EVANSTON, Petitioner-Appellant, v. THE ILLINOIS STATE LABOR RELATIONS BOARD *et al.*, Respondents-Appellees.

First District (1st Division)   No. 1—89—2629

Opinion filed March 30, 1992.

Seyfarth, Shaw, Fairweather & Geraldson, of Chicago (John T. Weise and Sigismund L. Sapinski, Jr., of counsel), for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Robert G. Toews, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois State Labor Relations Board.

Cornfield & Feldman, of Chicago (J. Dale Berry, of counsel), for respondent Evanston Fire Fighters Association Local 742.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

On July 20, 1988, the Evanston Fire Fighters Association 742, International Association of Fire Fighters, AFL-CIO-CLC (the Union), filed a unit clarification petition with the Illinois State Labor Relations Board (the Board) pursuant to section 1210.70 of the Board's rules and regulations (see 80 Ill. Admin. Code §1210.70 (1991)). The petition sought a clarification as to whether certain assistant fire chief and division chief positions within the City of Evanston's (the City's) fire department should properly be included within an existing historical collective bargaining unit.

The Board held hearings on the petition before a hearing officer who recommended upon their termination that the contested positions be included within the bargaining unit. The Board subsequently adopted the decision of the hearing officer, and the City thereafter timely filed this petition for administrative review. We affirm.

The City, with a population of 74,000, has a council-manager form of government with a city manager as the chief administrative officer. The City has approximately 30 departments including a fire department. Each department head reports to the city manager; the department head for the fire department is the fire chief.

There are approximately 108 sworn personnel in the City's fire department located across five fire stations. These personnel presently embrace the following six job classifications within the City's civil service system: fire chief, deputy chief, division chief, assistant fire chief, fire captain and fire fighter. Since 1970, the Union has historically represented in formal collective bargaining the classifications of fire fighter and fire captain. These classifications are covered by the City's formal civil service system and receive protection under it concerning matters of discipline, suspension, termination and promotion. On the other hand, the various "chief" classifications above captain have never been within the bargaining unit, receive no civil service protection, and serve at the will of the city manager.

When the parties' first collective bargaining agreement began in 1970, there were five assistant fire chiefs within the Department, including one "Assistant Chief-Fire Prevention," one "Assistant Chief-Training Officer," and three "Assistant Chief-Shift Commanders." In 1979, a number of changes occurred with respect to the assistant chief positions. One assistant chief-shift commander retired, and the other two shift commanders were relieved of duty and given administrative responsibilities previously performed by the fire chief. Pursuant to City ordinance, the shift commander duties were then assigned to three bargaining unit captains, and a fourth captain received medical officer responsibilities. All captains receiving the new responsibilities signed a "temporary duty agreement" in which they recognized the temporary nature of the assignment. As consideration, the City unilaterally paid, in addition to salary, a $365-per-month stipend to the captains. As required by ordinance, the City renewed these temporary duty assignments each year from 1981 until 1987.

Significantly, by accepting the assignment, the captains lost the protections afforded by the civil service system and the collective bargaining agreement with respect to the new assignments; however, the captains always retained their civil service classification of captain and their membership within the bargaining unit.

In November 1987, the City appointed a new fire chief, Raymond Brooks. Brooks undertook to reorganize the fire department and decided that the shift commander and medical officer responsibilities should be realigned with management. To achieve this goal, three "Assistant Fire Chief-Shift" (AFC-S) positions were "created," filled and assigned all the shift commander responsibilities previously performed by the bargaining unit captains. Next, a "Division Chief-Emergency Medical Services" (DC-EMS) position was "created," filled and assigned all the medical officer responsibilities. Finally, the two remaining assistant fire chief positions were renamed "Division Chief-Training and Operations" and "Division Chief-Fire Prevention," but their duties remained the same.

In December 1987, the union filed a grievance pursuant to the parties' collective bargaining agreement. The grievance alleged, in part, that the City violated the contract by creating the four new chief positions (three AFC-S and one DC-EMS) and designating them as nonunit positions when the bargaining unit had historically included the captains who had performed the functions of the new chiefs. The grievance was processed up to the arbitration stage and a hearing was scheduled for July 27, 1988. The Union then requested

that the arbitration be postponed pending the outcome of its July 20, 1988, unit clarification petition. This request was granted.

As with the grievance, the unit clarification petition sought a clarification that the historical bargaining unit should include the three AFC-S and one DC-EMS. The Union asserted that the individuals in these positions have responsibilities that were previously performed by bargaining unit captains and, consequently, the bargaining unit should be clarified to include these positions.

A hearing on the unit clarification petition was held in late 1988 before a hearing officer. Evidence produced at the hearing reflected the above facts as well as the following duties and responsibilities of the positions in question:[1]

### CAPTAIN-SHIFT COMMANDERS

The Department provides two basic functions, fire suppression and emergency medical services. The majority of fire fighters and fire captains perform functions related to fire suppression. When they are not engaged in the actual fighting of a fire or responding to an emergency, fire suppression personnel participate in routine housekeeping and equipment checking duties, as well as in previously scheduled training exercises and inspection programs.

Most nonemergency activities were developed and scheduled in advance by the various assistant chiefs and the deputy chief. The Captain-Shift Commanders (Shift Commanders) supervise the routine housekeeping and equipment checks and conduct the training and inspection programs. In addition, they prepare training records and inspection reports. The Shift Commanders were primarily responsible for ensuring that both routine and scheduled activities were carried out in accordance with Department procedures and directives. Shift Commanders could and did temporarily suspend and reschedule projects in exigent circumstances, such as cleaning up after a fire or inclement weather.

Shift Commanders were responsible for most matters relating to staffing and scheduling the personnel on their shifts. Although minimum manning levels were set by the fire chief, the Shift Commanders were responsible for the daily monitoring of attendance and manpower shortages. They had independent authority to call in off-duty

---

[1]The following facts are taken substantially from the hearing officer's findings of facts. The City in its brief does not supply this court with a complete discussion of the various witnesses' testimony. In any event, we find the hearing officer's factual findings to be well supported by the record.

personnel, hire back personnel from the previous shift or run the shift below minimum. The Shift Commanders assigned fire fighters and fire captains to the various pieces of apparatus and designated a fire fighter to act as company officer if a captain was absent. The Shift Commanders made recommendations regarding shift transfers. They in addition approved duty trades and short day requests for members of their shifts.

The Shift Commanders did not participate in the housekeeping, training and inspection duties with the captains and fire fighters. Instead, they spent a majority of their day going around to each station to pick up and deliver reports and correspondence, to meet with captains, the deputy chief and the various assistant chiefs, to work on special projects and complete routine paperwork. They also took part in staff meetings, attended by the various chiefs. During the meetings, the staff would discuss a broad range of topics, including new training and inspection programs and proposed changes in Department rules and regulations. The Shift Commanders considered themselves part of the management structure and an integral part of the decision-making process. However, like regular captains and fire fighters, the Shift Commanders worked 24-hour shifts.

The Shift Commanders had certain authority to discipline the fire captains on their shifts. They issued oral and written reprimands and recommended suspensions for violations of Department rules. The Shift Commanders computed annual written performance evaluations for the captains and evaluated, along with the deputy chief, fire fighters who applied to become captains. The Shift Commanders also researched new equipment purchases and recommended specific requests to be incorporated into the Department's budget by the deputy chief, who is the chief budget officer.

The Shift Commanders' role in an emergency response was to assume command at the scene of a fire. They rarely were involved in the actual physical activities associated with fire fighting such as hose line, rescue, ventilation and salvage operations. Rather, through both radio and face-to-face communications, they directed the fire fighters and captains in their effort to extinguish a fire. They determined the size of the fire, called for additional support if necessary, and coordinated the simultaneous operations where multiple companies were involved. The Shift Commanders responded to all structural or building fire calls and to unusual minor incidents, such as those involving violent crimes and medical emergencies. The Shift Commanders could elect not to respond to routine, minor incidents, such as odor investigations, fallen branches or garbage can fires. Those incidents were

typically handled by a single company with a captain or the medical officer supervising the operation.

In the Department's chain of command, the Shift Commanders were directly above the captains and below the assistant chiefs.

ASSISTANT FIRE CHIEF-SHIFT

The AFC-S perform all the functions previously performed by the Shift Commanders. They have certain additional responsibilities as well.

With respect to disciplinary matters, the AFC-S participate as management's representative in City and Department disciplinary proceedings wherein they present evidence and make recommendations regarding discipline of shift personnel that exceeds a one-day suspension.

The AFC-S report to the division chief-training and operation (formerly titled assistant chief-training) rather than to the deputy chief. As of the hearing dates, the AFC-S reported directly to the fire chief as the assistant chief-training and operation was preoccupied with other matters. The AFC-S meet with the fire chief on a daily basis and discuss the day's scheduled activities, attendance, pending disciplinary actions and special assignments.

Like the Shift Commanders, the AFC-S are involved in "special" projects, such as reviewing the Department's rules and regulations and recommending changes. The AFC-S also assist in the formulation of Department policy and procedures regarding emergency response, staffing and work hours through participation in staff meetings and drafting new programs. Unlike Shift Commanders, the AFC-S have the authority to implement changes in Department policy pertaining to shift operations without seeking approval from higher ranking officers. In practice, however, the AFC-S consult with the fire chief in such situations.

The AFC-S have independent authority to transfer personnel from one shift to another. Unlike the Shift Commanders, their role in this regard is not limited to merely recommending transfers.

The City plans to assign additional duties to the AFC-S relating to contract administration and collective bargaining. First, the City intends to designate the AFC-S as the first step in the parties' contractual grievance procedure. The AFC-S currently have no responsibilities pertaining to grievance resolution. Under the parties' most recent collective bargaining agreement, the first step in the grievance procedure is the deputy chief, who is second in command in the Department. Second, the City intends to include the AFC-S as part of

the City's negotiation team. Third, the City plans to consult with AFC-S regarding union contract proposals. Previously, the Shift Commanders were never involved with collective bargaining planning or negotiations. Rather, the fire chief, the deputy chief and the former assistant chiefs participated on behalf of the Department in previous planning and negotiation sessions.

In the Department's chain of command, the AFC-S are directly above the captains and below the former assistant chiefs, now titled division chiefs.

### CAPTAIN-MEDICAL OFFICER

The function of the captain-medical officer (Medical Officer) was to oversee the Department's emergency medical services division, which is staffed by fire fighters and fire captains who are certified as paramedics. Unlike the shift personnel, the Medical Officer worked from 8:30 a.m. to 5 p.m., Monday through Friday.

A primary responsibility of the Medical Officer was EMS training. The Medical Officer selected a topic, procured an instructor and determined a time and place to conduct the training. The Medical Officer coordinated EMS training with the deputy chief, who oversaw operations for all three shifts. The Medical Officer participated in certain of the training exercises, such as those required to maintain State certification as a paramedic.

The Medical Officer prepared and reviewed reports and maintained official records pertaining to the EMS division. These included ambulance reports, ambulance drug inventory sheets, trauma box sheets, training records and roster sheets. He compiled and recorded statistical data into a computer to create permanent records of all personnel activity, vehicle utilization, and equipment use that pertained to emergency medical services. If an ambulance or piece of medical equipment was not in working order, the Medical Officer ensured that it was replaced or repaired.

The Medical Officer monitored all EMS calls and responses through radio communications. He went to the scene of major EMS incidents and assumed command of the rescue operations. At the scene of the emergency, he assessed the situation and determined needs in terms of treatment, special equipment and additional manpower and vehicle assistance. He observed the performance of shift personnel to ensure that they followed standard operating procedures as established by St. Francis Hospital. The Department has no authority to deviate from the procedures established by the hospital. St. Francis Hospital regularly updates and reviews standard operating

procedures and holds EMS coordinator meetings for the benefit of all the fire departments in the St. Francis system. The medical officer attended the meetings on the Department's behalf, informed EMS personnel of new developments, and integrated the changes into the Department's EMS procedures.

The Medical Officer initiated and developed changes in Department rules and procedures concerning the delivery of emergency medical services, and with the chief's approval, issued directives to EMS personnel dictating that the new procedures be followed. Such approval was routinely granted.

The Medical Officer prepared the budget for the EMS division. He formulated goals or objectives for the Division. He compiled statistics, categorized calls, analyzed data and projected expenditures. He researched new equipment and education programs and prepared purchase requests. He forwarded this information to the deputy chief who, together with the fire chief, prepared the Department's annual budget and submitted it to the City's budget officer.

The Medical Officer performed certain community relations functions. He handled citizen complaints pertaining to the quality of care delivered by the EMS division and addressed various civic groups.

The Medical Officer conducted field tests to the homes of Department members who were absent due to illness. The Medical Officer determined whether and to what extent the Department took part in multicommunity disaster drills and, with the chief's consent, committed Department manpower and equipment for use in the drills. The chief granted such consent as a matter of course.

### DIVISION CHIEF-EMERGENCY MEDICAL SERVICES

The DC-EMS performs all of the functions previously performed by the Medical Officer. In addition, like the new AFC-S, the DC-EMS participates in due cause and predisciplinary hearings as a representative of management.

The DC-EMS is regarded by both himself and the fire chief as a member of the Department's management staff. As such, the DC-EMS has the authority to implement changes in Department policy pertaining to the EMS program without prior approval from the chief. The chief nonetheless retains the authority to overrule the division chief's actions.

Following the close of evidence, the hearing officer recommended that the bargaining unit be clarified to include the DC-EMS and three AFC-S positions. Subsequently, the Board issued a decision and order

adopting the hearing officer's recommendation which it served on September 1, 1989.

On administrative review, the City alleges: (1) the petition should have been dismissed on jurisdictional grounds or otherwise deferred to arbitration; (2) the petition should have been dismissed because the nature of the case precludes resolution by way of unit clarification petition; (3) the Board's decision to include the new positions within the bargaining unit is against the manifest weight of the evidence where the shift commander and medical officer assignments have been historically excluded from the bargaining unit; (4) the new positions should not be included within the bargaining unit because they are excluded from protection as managerial and confidential under the Illinois Public Labor Relations Act (the Act) (Ill. Rev. Stat. 1987, ch. 48, par. 1601 *et seq.*); and (5) the new job positions entail different duties than those previously performed by the captains and should be excluded.

Prior to addressing the merits of the City's appeal, we must first address whether we have subject matter jurisdiction to hear an appeal from a final Board order relating to a unit clarification petition. In its brief, the City failed to indicate the source of this court's jurisdiction. The Board cites section 9(i) of the Act (Ill. Rev. Stat. 1987, ch. 48, par. 1609(i)) as the proper source of jurisdiction. While we agree with the Board that we have jurisdiction, we believe that our jurisdiction rests under section 11(e) of the Act (Ill. Rev. Stat. 1987, ch. 48, par. 1611(e)) and not section 9(i).

Sections 9 and 11 of the Act deal with two distinct subject matters. Section 9 pertains to petitions for representation filed by employees, unions or employers; the direction of elections by the Board; Board dismissal or representation petitions; Board certification of an exclusive representative after election; and unit appropriateness. Section 11, however, deals with unfair labor practices and procedures.

Prior to July 1, 1988, section 11(e) of the Act contained the only language applicable to direct appellate review of final orders of the Board. In *Laborer's International Union, Local 1280 v. Illinois State Labor Relations Board* (1987), 154 Ill. App. 3d 1045, 507 N.E.2d 1200, this court held that section 11(e) allowed for appellate review by "any person aggrieved by a final order of the Board entered under the Act." (*Laborer's International,* 154 Ill. App. 3d at 1051, 507 N.E.2d at 1204.) At the time that case was decided, section 11(e) provided:

> "§11. Unfair Labor Practice Procedures. Unfair labor practices may be dealt with by the Board in the following manner:

* * *

(e) A charging party or any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may apply for and obtain judicial review of *an order of the Board entered under this Act,* in accordance with the provisions of the Administrative Review Law, as now or hereafter amended, except that such judicial review shall be afforded directly in the appellate court for the district in which the aggrieved party resides or transacts business. The Board in proceedings under this Section may obtain an order of the court for the enforcement of its order." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 48, par. 1611(e).

In interpreting the above paragraph, the court emphasized the highlighted language and specifically rejected the assertion that appellate review under the Act was limited to review of final Board orders which only related to unfair-labor-practice charges. Instead, although recognizing that different purposes exist between sections 9 and 11 of the Act and that section 11 contained the only appellate review provision, the court interpreted section 11(e) to allow for appellate review of *any* final Board order entered under the Act. *Laborer's International,* 154 Ill. App. 3d at 1051, 507 N.E.2d at 1204.

While the appeal in *Laborer's International* dealt with a final order of the Board dismissing a union's representation petition brought pursuant to section 9, the jurisdiction of this court in *City of Burbank v. Illinois State Labor Relations Board* (1988), 168 Ill. App. 3d 885, 523 N.E.2d 68, *aff'd as modified on other grounds* (1989), 128 Ill. 2d 335, 538 N.E.2d 1146, was found proper under section 11(e) in an appeal from a final Board order which dismissed two unit clarification proceedings. *City of Burbank* followed the rationale of *Laborer's International* that appellate review in this court is proper over all final orders of the Board entered pursuant to the Act. *City of Burbank,* 168 Ill. App. 3d at 889, 523 N.E.2d at 71; see also *Board of Regents of the Regency Universities System v. Illinois Educational Labor Relations Board* (1988), 166 Ill. App. 3d 730, 520 N.E.2d 1150 (interpreting language similar to section 11(e) under Illinois Educational Labor Relations Act (Ill. Rev. Stat. 1985, ch. 48, par. 1716(a)) to include review of any final order).

The foregoing review provides a foundation for understanding how this court's jurisdiction was affected by legislative amendments to the Act which became effective July 1, 1988. On that date, the Act was amended by the addition of a new jurisdictional paragraph to section 9 (Ill. Rev. Stat. 1989, ch. 48, par. 1609(i)) and by adding restric-

tive jurisdictional language to paragraph 11(e) corresponding to the new language added in section 9. As amended, section 11(e) now provides:

"(e) A charging party or any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may apply for and obtain judicial review of an order of the Board entered under this Act, in accordance with the provisions of the Administrative Review Law, as now or hereafter amended, except that such judicial review shall be afforded directly in the appellate court for the district in which the aggrieved party resides or transacts business, *and provided, that such judicial review shall not be available for the purpose of challenging a final order issued by the Board pursuant to Section 9 of this Act for which judicial review has been petitioned pursuant to subsection (i) of Section 9.* The Board in proceedings under this Section may obtain an order of the court for the enforcement of its order." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 48, par. 1611(e).)

Section 9(i) as enacted provides as follows:

"(i) An order of the Board dismissing a representation petition, determining and certifying that a labor organization has been fairly and freely chosen by a majority of employees in an appropriate bargaining unit, determining and certifying that a labor organization has not been fairly and freely chosen by a majority of employees in the bargaining unit or certifying a labor organization as the exclusive representative of employees in an appropriate bargaining unit because of a determination by the Board that the labor organization is the historical bargaining representative of employees in the bargaining unit, is a final order. Any person aggrieved by any such order issued on or after the effective date of this amendatory Act of 1987 may apply for and obtain judicial review in accordance with provisions of the Administrative Review Law, as now or hereafter amended, except that such review shall be afforded directly in the Appellate Court for the district in which the aggrieved party resides or transacts business." Ill. Rev. Stat. 1989, ch. 48, par. 1609(i).

As we interpret the new amendments, section 9(i) of the Act permits administrative review in this court for four specific, final Board orders. These Board orders are reviewable under this section only and cannot be brought pursuant to section 11(e). This much is clear when the two amendments are read together.

■ A review of the amendments leads one to the inquiry of under which provision does this court have authority to administratively review final Board orders relating to unit clarification proceedings. Clearly, section 9 of the Act embraces such proceedings; however, the legislature apparently chose not to allow for their review under section 9(i). Again, appellate review under that section is limited to the four orders there specified. We interpret the legislative amendments to mean that appellate review of final Board orders relating to unit clarification petitions occurs, as it historically has, pursuant to section 11(e). (See *Hupp v. Gray* (1978), 73 Ill. 2d 78, 382 N.E.2d 1211; 1A N. Singer, Sutherland on Statutory Construction §22.30 (Sands 4th ed. 1985).) Certainly, the language which permitted such review initially under that section has not been changed by the amendments, and the amendments contain no language which expressly prohibits such review. Accordingly, for these reasons, we find our jurisdiction to administratively review the Board action in this case rests in section 11(e) and not section 9(i).

Turning to the merits of the City's appeal, we initially note that our review of the Board's order is governed by the provisions of the Administrative Review Law (Ill. Rev. Stat. 1987, ch. 110, par. 3—101 *et seq.*). Section 3—110 of that statute specifies that judicial review of agency action extends to all questions of law and fact presented in the record. (Ill. Rev. Stat. 1987, ch. 110, par. 3—110.) This section further provides that the agency's findings and conclusions on questions of fact shall be held *prima facie* true and correct. Where the findings of fact are against the manifest weight of the evidence and it is clearly evident that the Board should have reached the opposite conclusion, a reviewing court may reverse the agency's findings of fact. (*City of Freeport v. Illinois State Labor Relations Board* (1990), 135 Ill. 2d 499, 507, 554 N.E.2d 155, 159.) Where the question involved is one of law, such as the proper interpretation of a statute, the Board's finding is not binding on the court (*Freeport*, 135 Ill. 2d at 507, 554 N.E.2d at 159-60; *City of Burbank v. Illinois State Labor Relations Board* (1989), 128 Ill. 2d 335, 345, 538 N.E.2d 1146, 1149); however, administrative decisions interpreting the legal effect of statutory language are generally given great weight by the judiciary. (*City of Wood Dale v. Illinois State Labor Relations Board* (1988), 165 Ill. App. 3d 640, 643, 521 N.E.2d 103, 105-06; *Laborer's International Union, Local 1280 v. Illinois State Labor Relations Board* (1987), 154 Ill. App. 3d 1045, 1057, 507 N.E.2d 1200, 1208.) Measured against this standard of review, the City's contentions will now be addressed.

The first issue we address is whether the Board erred in failing to dismiss the unit clarification petition on jurisdictional grounds or otherwise defer the matter to arbitration. To support its argument on these matters, the City directs this court to the parties' collective bargaining agreement where it notes that a grievance, which is defined as a "difference of opinion *** with respect to the meaning or application of the terms of this Agreement," may be referred to binding arbitration in the event the grievance is not settled. The City also notes that under the "management rights" clause, the City retained the right "to plan, direct, control and determine the operations or services to be conducted in or at the fire department by the employees of the City." Under the "recognition" clause, the City notes that all chief classifications are expressly excluded from the Union's jurisdiction. Finally, the City notes that the Union voluntarily instituted arbitration proceedings which currently are postponed for resolution of this unit clarification petition. Taking these arguments together, the City asserts that because this case involves nothing more than the proper interpretation of the parties' collective bargaining agreement, the Board has no jurisdiction or at least should defer to the internal remedies provided within the agreement.

We encounter great difficulty in interpreting the City's arguments. The City has cited no provision of the Act, Board regulation or provision of the parties' collective bargaining agreement which would *prohibit* the Board from entertaining the Union's unit clarification petition or otherwise *require* the Board to defer to arbitration. This City in essence asks this court to substitute our judgment for that of the Board on the issue of whether the parties' dispute is more appropriately resolved by arbitration than by unit clarification proceedings. This we will not do.

■ Section 9(b) of the Act grants the Board authority to determine a "unit appropriate for the purpose of collective bargaining." (Ill. Rev. Stat. 1987, ch. 48, par. 1609(b).) Regulations adopted by the Board pursuant to the Act allow an exclusive representative or employer to file a petition to clarify an existing bargaining unit. (See 80 Ill. Adm. Code §1210.70 (1991).) In *State of Illinois (Department of Central Management Services & Public Aid)*, 2 Pub. Employee Rep. (Ill.) par. 2019, No. S—UC—46 (ISLRB April 2, 1986), the Board reiterated the four situations in which unit clarification petitions are appropriate: (1) a newly created job classification entailing job functions similar to functions already covered in the unit; (2) an existing classification's duties and responsibilities have undergone recent substantial changes raising an issue as to whether the position continues to be in-

cluded in or excluded from the unit; (3) employees were overlooked by the parties through inadvertence or misunderstanding when the unit was created; and (4) there has been a change in statutory or case law affecting the bargaining rights of employees.

As noted, the City has not argued that the regulations authorizing unit clarification proceedings are invalid or that the four situations delineated by the Board are inappropriate triggers for a unit clarification proceeding. We will not address an issue which a party has failed to raise. We will comment, however, that one recent case approved the four situations listed above (*American Federation of State, County & Municipal Employees, Council 31 v. Chief Judge of the Circuit Court* (1991), 209 Ill. App. 3d 283, 568 N.E.2d 139), and other cases have reviewed appeals of unit clarification proceedings without apparent concern as to when a unit clarification proceeding is appropriate. *City of Burbank*, 168 Ill. App. 3d 885, 523 N.E.2d 68; *Board of Education of Community Consolidated High School District No. 230 v. Illinois Educational Labor Relations Board* (1987), 165 Ill. App. 3d 41, 518 N.E.2d 713.

■ Assuming the four situations are proper triggers for a unit clarification proceeding, we affirm the Board's finding that a unit clarification proceeding was appropriate in this case to resolve the parties' dispute. Here, the hearing officer recommended, and the Board adopted, the finding that the petition was appropriate under the first two situations. Regarding the DC-EMS position, the petition was found appropriate under the first trigger because it constituted a new classification entailing job functions similar to those covered in the unit. Regarding the AFC-S position, the petition was found appropriate under the second trigger because the City's action of (1) transferring the duties of the Captain-Shift Commanders to the assistant chief level, and (2) retitling the former assistant fire chiefs as divisions chiefs without change in job functions amounted to a substantial change of job function regarding the assistant chief classification, which in turn raised the issue of whether the employees in that title are to be included in or excluded from the unit.

The record supports the Board's findings. First the position of DC-EMS was created during the November 1987 reorganization and the duties covered by the position are similar to duties previously performed by the bargaining unit medical officer. Second, the assistant fire chief classification underwent substantial change during the 1987 reorganization in that the shift commanders are now assistant fire chiefs and the old assistant fire chiefs are now division chiefs.

We also reject the City's argument that the Board was required to defer consideration of the unit clarification petition and, instead, allow the parties to resolve their dispute pursuant to the agreement's grievance and arbitration procedures. Again, nothing in the Act mandates that the Board defer addressing a unit clarification proceeding even where, as here, the issues raised in the clarification proceeding relate to the interpretation of the collective bargaining agreement. While section 11(i) of the Act grants *discretionary* authority to the Board to defer *unfair labor-practice* charges involving the interpretation of a collective bargaining agreement to binding arbitration (see Ill. Rev. Stat. 1987, ch. 48, par. 1611(i)), no parallel provision exists under the Act relating to unit determinations by the Board. (See generally Ill. Rev. Stat. 1987, ch. 48, par. 1609.) The absence of such a parallel provision undermines the City's argument that deferral was required.

More importantly, while the Board has yet to address the issue of deferral in unit clarification settings, the National Labor Relations Board (NLRB) has *refused* to defer in such situations even though the issues raised in a clarification setting are closely related to a contract dispute between the parties. (See *National Labor Relations Board v. Magna Corp.* (5th Cir. 1984), 734 F.2d 1057 (and cases cited therein).) The NLRB reasons that deferral is inappropriate because unit clarification proceedings involve issues of unit appropriateness and the application of statutory policy and criteria which are particularly within the NLRB's expertise. *Magna Corp.*, 734 F.2d at 1063-64.

The NLRB's rationale finds support within the Act. Section 9 vests the Board with the authority and responsibility to determine proper units for collective bargaining. This section enumerates numerous factors which the Board is to employ in making these determinations. See Ill. Rev. Stat. 1989, ch. 48, par. 1609(b); see also *Laborer's International Union, Local 1280 v. Illinois State Labor Relations Board* (1987), 154 Ill. App. 3d 1045, 1057, 507 N.E.2d 1200, 1204 (Act and NLRA are to be interpreted similarly where Act's language parallels that of Federal act).

In summary, although the Union has filed a grievance pursuant to the collective bargaining agreement, and although the parties' dispute implicates their collective bargaining agreement, the dispute over the classifications in this case involves unit appropriateness, a matter which falls within the Board's acknowledged expertise. We will not substitute our judgment for that of the Board on the issue of whether deferral to arbitration would better resolve the parties' dispute.

■ The City's next contention on appeal is that the manifest weight of the evidence showed that the Shift Commander and Medical

Officer responsibilities were never part of the historical bargaining unit. We disagree.

Conflicting evidence was presented to the hearing officer on the issue of whether the parties treated the individuals performing the Shift Commander and Medical Officer assignments as part of the bargaining unit. To support its argument, the City cites to the evidence that: (1) from 1940 to 1979, the Shift Commander and Medical Officer duties were performed by personnel holding the classification of assistant fire chief; (2) the assignment of Shift Commander and Medical Officer duties to bargaining unit captains occurred pursuant to City ordinance in 1979; (3) the ordinance only authorized the assignments to be temporary and required yearly renewal; (4) the captains receiving the assignments signed a temporary assignment agreement; (5) the captains considered themselves part of management rather than part of the bargaining unit; and (6) the captains lost the protections of the collective bargaining agreement regarding the assignment. Taken together, the City contends the evidence was "conclusive" that the parties did not consider the Shift Commander and Medical Officer assignments as part of the bargaining unit.

We believe the Board correctly determined that over time, the Shift Commander and Medical Officer assignments became work to be expected and performed by bargaining unit personnel. Much of the evidence the City cites pertains to how the City complied with its own ordinance in creating and renewing the temporary duty assignments. While such compliance may be required at the City level, and while this evidence is probative of whether the assignments became part of the unit, the City ignores how the Department itself treated the assignments.

For example, the Union introduced evidence showing how, over time, the captains performing the "temporary" assignments increased in stature. When the assignments first occurred, a Department organizational chart introduced by the Union designated the persons performing the temporary assignments as "Fire Captain-Shift Commander" and "Fire Captain-Medical Officer." By 1986, the Department's rules and regulations separately designated these persons as "Shift Commander" and "Medical Officer." The rules also set forth the respective authority of these officers, which was distinct from that given to the assistant fire chiefs and company officers.

The evolving nature of the position of "Fire Captain-Shift Commander" to only Shift Commander must be taken in the context of how the parties bargained with respect to the disputed individuals. During the entire time of the "temporary" assignments, the captains holding

these assignments were represented by the Union as to their salaries, hours, fringe benefits and conditions of employment. The fact that the Union continued to represent these captains despite their apparent alignment with management demonstrates that the parties treated the captains as part of the bargaining unit. While the parties did not bargain regarding the stipend paid to the Captains, nothing in the Act requires bargaining as to every term of employment when determining historical recognition. *City of Calumet City*, 2 Pub. Employee Rep. (Ill.) par. 2047, No. S—RC—143 (ISLRB September 24, 1986).

In summary, we believe the Board was entitled to resolve the conflicting nature of the evidence in favor of including the Shift Commander and Medical Officer assignments within the bargaining unit. How the parties treated these assignments became an issue of fact for the Board to resolve. (See *City of Peoria v. Illinois State Labor Relations Board* (1988), 165 Ill. App. 3d 429, 518 N.E.2d 1325.) We will not disturb its finding on review.

■ Having concluded that the historical bargaining unit encompassed those captains performing the Shift Commander and Medical Officer assignments, we note that the Act gives strong protections to members of historical bargaining units. Section 9(b) of the Act directs the Board to "find the employees in the unit then represented by the union pursuant to the recognition to be the appropriate unit." (Ill. Rev. Stat. 1987, ch. 48, par. 1609(b); see *City of Peoria*, 165 Ill. App. 3d at 436, 578 N.E.2d at 1330.) This strong protection is further echoed in section 9(c):

> "Nothing in this Act shall interfere with or negate the current representation rights of patterns and practices of labor organizations which have historically represented public employees for the purpose of collective bargaining, including but not limited to negotiations of wages, hours and working conditions, discussions of employees' grievances, resolution of jurisdictional disputes, or the establishment and maintenance of prevailing wage rates ***." (Ill. Rev. Stat. 1987, ch. 48, par. 1609(c).)

Finally, various sections of the Act provide strong protections to fire fighters in bargaining units existing as of January 1, 1986, even though such fire fighters would otherwise qualify for exclusion under the Act because of his or her "supervisor" status. See Ill. Rev. Stat. 1987, ch. 48, pars. 1603(r), (s)(1), 1609(b).

The strong protections afforded by the Act to the captains in this case preclude the City from unilaterally reassigning bargaining unit work to a historically excluded classification such as assistant fire chief and arguing thereafter that this work is now excluded because

the person performing it is within a historically excluded classification. To hold otherwise would permit the City to reclassify any bargaining unit position within the Department as an excluded chief position. Such conduct violates the express provisions of the Act noted above, and the Board properly recognized as much.

We now address the issue of whether the addition of duties to the three new AFC-S and DC-EMS positions required their exclusion from the bargaining unit on the grounds that the employees in these positions became "managerial" or "confidential" employees under the Act or otherwise became inappropriate for inclusion in the historical bargaining unit.

The Act provides a comprehensive system of collective bargaining for those public employees and employers who fall within its scope. (*City of Freeport v. Illinois State Labor Relations Board* (1990), 135 Ill. 2d 499, 554 N.E.2d 155.) Relevant to the issue of inclusion or exclusion under the Act is the following definition of "employee": "any individual employed by a public employer *** but excluding all the following: *** managerial employees; *** confidential employees; *** and supervisors except as provided in this Act." Ill. Rev. Stat. 1987, ch. 48, par. 1603(n).

Regarding the "managerial employee" exclusion, the Act defines this term as follows:

> "(j) 'Managerial employee' means an individual who is engaged predominantly in executive and management functions and is charged with the responsibility of directing the effectuation of such management policies and practices." Ill. Rev. Stat. 1987, ch. 48, par. 1603(j).

The Board has developed a two-part test for determining when an employee is a managerial employee. First, the employee must be predominately engaged in executive and management functions. Second, the employee must exercise responsibility for directing the effectuation of management policies and procedures. *State of Illinois (Department of Central Management Services & Public Aid)*, 2 Pub. Employee Rep. (Ill.) par. 2019, No. S—UC—46 (ISLRB April 2, 1986); *State of Illinois (Department of Central Management Services)*, 1 Pub. Employee Rep. (Ill.) par. 2014, Nos. S—UC—6, S—UC—8 (ISLRB July 17, 1985).

As to the first prong of the test, the Board has defined executive and management functions to be those functions which specifically relate to the running of an agency or department, which may include establishment of policies and procedures, preparation of the budget and the responsibility for assuring that the agency or depart-

ment operates effectively and efficiently. (*State of Illinois (Department of Central Management Services)*, 1 Pub. Employee Rep. (Ill.) par. 2014, Nos. S—UC—6, S—UC—8 (ISLRB July 17, 1985).) Executive functions require more than the exercise of professional discretion and technical expertise; an individual must possess and exercise authority and discretion sufficiently to broadly effect a department's goals or means of achieving its goals. (*State of Illinois (Department of Central Management Services & Public Aid)*, 2 Pub. Employee Rep. (Ill.) par. 2019, No. S—UC—46 (ISLRB April 2, 1986).) Additionally, where an employee's role in establishing policy is advisory and subordinate, the employee is not a managerial employee, as it is the final responsibility and independent authority to establish and effectuate policy that determines managerial status under the Act. *State of Illinois (Department of Central Management Services)*, 1 Pub. Employee Rep. (Ill.) par. 2014, Nos. S—UC—6, S—UC—8 (ISLRB July 17, 1985).

■ With respect to the second part of the definition, the Board has stated that an individual directs the effectuation of management policy when he oversees or coordinates policy implementation by developing the means and methods of achieving policy objectives and by determining the extent to which the objectives will be achieved. Such individuals must be empowered with a substantial measure of discretion to determine how policies will be effected. *State of Illinois (Department of Central Management Services & Public Aid)*, 2 Pub. Employee Rep. (Ill.) par. 2019, No. S—UC—46 (ISLRB April 2, 1986).

In this case, the City does not contend that the Board applied an incorrect formulation for determining who constitutes a managerial employee; rather, the City asserts that the Board's findings are against the manifest weight of the evidence. This is a factual finding (*cf. City of Burbank*, 168 Ill. App. 3d at 896, 523 N.E.2d at 75), which we accord appropriate deference on review.

■ The evidence supports the Board's conclusion that the individuals in the AFC-S and DC-EMS positions do not qualify as managerial employees. This much is suggested by the Department's chain of command. Neither the AFC-S nor DC-EMS represents the final level of management. The AFC-S report to the division chief-training and operations, and the DC-EMS reports to the fire chief and his deputy fire chief. The fire chief also serves at the pleasure of the city manager.

The above hierarchy suggests that the AFC-S and DC-EMS do not qualify as managerial employees. Their roles in policy development and effectuation are subordinate and advisory, and they do not have the authority and discretion to broadly effect the Department's goals or means of achieving such goals. Moreover, much of their au-

thority stems from their professional and technical expertise rather than any independent authority. Again, executive functions require more than the exercise of professional discretion and technical expertise. Finally, managerial status should not be confused with "supervisor" status. While the AFC-S and DC-EMS have indicia of being supervisors under the Act (see Ill. Rev. Stat. 1989, ch. 48, par. 1603(r)), supervisory and managerial status entail different inquiries.

Our conclusion that the AFC-S and DC-EMS positions are not managerial is supported by two of our previous holdings on the issue. In *Salaried Employees v. Illinois Local Labor Relations Board* (1990), 202 Ill. App. 3d 1013, 560 N.E.2d 926, we recognized that managerial status is not limited to those employees at the very highest level of a government entity, and that it is enough if the functions performed by the employees sufficiently align them with management such that the employees should not be in a position to divide their loyalties to the administration and the union. *Salaried Employees*, 202 Ill. App. 3d at 1020-21, 560 N.E.2d at 932.

In that case, we held that attorneys within the City of Chicago's law department were managerial employees. In support of our conclusion, we cited to (1) the functioning of the law department as a single cohesive unit with attorneys acting regardless of any management/union division, (2) the substantial amount of interaction between the attorneys and aldermen, city council, and mayor's office, and (3) the tremendous amount of discretion the attorneys exercised on behalf of the city. We found that these factors rendered impossible any reasonable division of the attorneys into distinct management and labor attorneys. *Salaried Employees*, 202 Ill. App. 3d at 1022-23, 560 N.E.2d at 933.

Similarly, in *Board of Regents of the Regency Universities System v. Illinois Educational Labor Relations Board* (1988), 166 Ill. App. 3d 730, 520 N.E.2d 1150, we addressed whether the managerial exclusion covered center directors for certain universities. In finding the directors to be managerial, we noted that the directors had the responsibility to seek personnel for the center; had absolute power to reject any faculty person from working at the center as well as any faculty project; could seek grants for the center; were responsible for the day-to-day operations of the center; and monitored a project once the project was approved. We concluded that the functions of the directors appeared "to represent the higher administration in negotiating and otherwise dealing with the faculty and the public." *Board of Regents*, 166 Ill. App. 3d at 742-43, 520 N.E.2d at 1158.

Unlike *Salaried Employees* and *Board of Regents*, the Department is a "para-military" organization with recognized levels of authority. We believe the Board correctly determined that the AFC-S and DC-EMS could properly be recognized as bargaining unit positions where those classifications were not so aligned with management that a division of loyalties between the City and the Union will result. From 1979-1987, the City apparently did not find any significant conflict between its Shift Commanders, Medical Officer and bargaining unit members as it would not have otherwise restructured the Department initially. As the day-to-day work of the new AFC-S and DC-EMS is substantially similar to that performed by the Shift Commanders and Medical Officer, the City's present cries of conflict are unpersuasive. To the extent the AFC-S and DC-EMS have new responsibilities regarding collective bargaining, grievance handling and disciplinary matters, we agree with the Board that these duties are not so significant that their existence makes inclusion within the bargaining unit inappropriate. As the Act does not require the most, best or perfect unit, but rather an "appropriate" unit (Ill. Rev. Stat. 1987, ch. 48, par. 1609(b)), we defer to the Board's expertise in determining that the positions in question were appropriately included within the historical unit and not entitled to managerial status.

▆▆▆ Turning to whether the AFC-S and DC-EMS positions qualify under the confidential employee exclusion, an employee meets this exclusion if the employee:

> "in the regular course of his or her duties, assists and acts in a confidential capacity to persons who formulate, determine and effectuate management policies with regard to labor relations or who in the regular course of his or her duties has authorized access to information or review of the employer's collective bargaining policies." Ill. Rev. Stat. 1987, ch. 48, par. 1603(c).

As with the managerial exclusion, the purpose of the confidential employee exclusion is to prevent employees from having their loyalties divided between the employer, who expects confidentiality in labor relations matter, and the union, which may seek disclosure of management's labor relations material to gain an advantage in the bargaining process. (*Chief Judge of the Circuit Court v. American Federation of State, County & Municipal Employees, Council 31* (1991), 218 Ill. App. 3d 682, 698, 578 N.E.2d 1020, 1032, *appeal granted* (1991), 142 Ill. 2d 652, 584 N.E.2d 127; *City of Wood Dale*, 2 Pub. Employee Rep. (Ill.) par. 2043, No. S—RC—261 (ISLRB September 5, 1986).) The exclusion avoids presenting the employer with a po-

tential situation in which its negotiations strategies in collective bargaining would be prematurely exposed to the employees with whom it will bargain. *Chief Judge of the Circuit Court*, 218 Ill. App. 3d at 698-99, 578 N.E.2d at 1032; *West Harvey-Dixmoor School District No. 147*, 2 Pub. Employee Rep. (Ill.) par. 1054, No. 85—UC—0015—C (IELRB April 8, 1986).

■■ In applying the language of the section, the Board has developed alternative tests for determining when an employee holds confidential status. First, under the "labor nexus" test, whether an employee holds confidential status depends on whether he or she assists and acts in a confidential manner to persons who formulate, determine and effectuate labor relations policies for the relevant department. Second, under the "authorized access" test, an employee holds confidential status if he or she has authorized access to information concerning matters arising from the collective bargaining process, such as information concerning the employer's strategy in dealing with an organizational campaign, actual collective bargaining proposals and the information relating to matters dealing with contract administration. (*Chief Judge of the Circuit Court*, 218 Ill. App. 3d at 698, 578 N.E.2d at 1033; *City of Wood Dale*, 2 Pub. Employee Rep. (Ill.) par. 2043, No. S—RC—261 (ISLRB September 5, 1986).) Mere access to "confidential" information concerning the general workings of the department or to personnel or statistical information upon which an employer's labor relations policy is based is insufficient to confer confidential status. *Board of Education of Community Consolidated High School District No. 230 v. Illinois Educational Labor Relations Board* (1987), 165 Ill. App. 3d 41, 518 N.E.2d 713.

■■ In this case, the City again does not urge that the Board applied an incorrect formulation of the confidential employee exclusion; rather, the City urges that the AFC-S and DC-EMS were shown to be confidential employees. Again, this is a factual finding (*City of Burbank*, 168 Ill. App. 3d at 896, 523 N.E.2d at 75), which we accord appropriate deference on review.

We believe it worth noting that the City did not directly urge before the hearing officer that the employees in question were confidential employees. Some evidence exists on the matter, but because the issue was not presented directly, the record does not contain substantial evidence regarding what role the AFC-S and DC-EMS will play in collective bargaining.

To the extent record evidence exists, we believe that the Board made the correct determination. First, the evidence as to this exclusion shows that there is only a future intention to use the AFC-S and

DC-EMS for input on collective bargaining matters. As the Board noted, the City has shown no signs of implementing its proposed future plans at the time of hearing even though the City and the Union were on the eve of another collective bargaining session. Second, the evidence supports the hearing officer's findings that any future role in the collective bargaining process would be merely advisory, with the fire chief, deputy chief and division chiefs undertaking the primary responsibility as they had done in the past. The hearing officer found no evidence that these officers' historic collective bargaining responsibilities were to be transferred or eliminated; rather, the AFC-S and DC-EMS were to become another layer in the collective bargaining process. Finally, we question whether the roles that the AFC-S and DC-EMS will play will meet the exclusion's requirement that they be of a confidential nature. The fire chief's testimony reflects that the chief will use the AFC-S and DC-EMS as factual resources regarding rank-and-file personnel.

Similarly, little evidence exists to qualify the employees in question under the authorized access test. We recognize that the AFC-S and DC-EMS will have access to certain confidential information; however, no evidence exists from which we can conclude that the AFC-S and DC-EMS will have authorized access to confidential, collective bargaining information. For these reasons, the manifest weight of the evidence supports the Board's decision that the AFC-S and DC-EMS do not qualify for confidential employee status.

For all the foregoing reasons, we affirm the order of the Board which clarified the bargaining unit to include the AFC-S and DC-EMS positions.

Affirmed.

CAMPBELL and O'CONNOR, JJ., concur.