BOARD OF REGENTS OF THE REGENCY UNIVERSITIES SYSTEM, State of Illinois, Petitioner, v. THE ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD *et al.*, Respondents.

Fourth District   No. 4—87—0351

Opinion filed March 3, 1988.—Rehearing denied April 5, 1988.

Richard J. Coffee II, of Springfield, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Shawn W. Denney, Solicitor General, Bret A. Rappaport, Assistant Attorney General, and Randi Hammer Abramsky, of Illinois Educational Labor Relations Board, of Chicago, of counsel), for respondent Illinois Educational Labor Relations Board.

Stephen A. Yokich, of Cornfield & Feldman, of Chicago, for appellee University Professionals of Illinois.

R. Theodore Clark, Jr., of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for *amicus curiae*.

PRESIDING JUSTICE GREEN delivered the opinion of the court:

On February 14, 1984, University Professionals of Illinois, Local 4100, Illinois Federation of Teachers, IFT/AFT/AFL-CIO (UPI), filed a petition with the Illinois Educational Labor Relations Board (IELRB) pursuant to section 7(c)(1) of the Illinois Educational Labor Relations Act (Act) (Ill. Rev. Stat. 1985, ch. 48, par. 1707(c)(1)) requesting an election by which it might obtain certification as the exclusive bargaining representative for certain employees at Sangamon State University (SSU), Illinois State University and Northern Illinois University, all under the governance of the Board of Regents of the Regency Universities System, State of Illinois (Board of Regents). The American Association of University Professors (AAUP) then filed a similar petition.

Elections were ultimately held at the three institutions. At those

other than SSU, the majority voted that no exclusive bargaining representative be created. No review has been sought from certification by IELRB of those results. On the other hand, at SSU, a dispute developed as to whether persons holding various positions were entitled to vote. After a hearing on challenges before a hearing officer in regard to the propriety of certain ballots, IELRB entered an order on April 17, 1987, sustaining challenges to some and overruling others. This order was formalized by a further order and opinion filed August 5, 1987. (*Board of Regents of State of Illinois*, 3 Pub. Employee Rep. (Ill.) par. 1098, case Nos. 84—0008, 84—0012 (Illinois Educational Labor Relations Board, Aug. 5, 1987).) On April 20, 1987, IELRB issued a further order certifying UPI as the exclusive collective-bargaining representative for the SSU unit. The Board of Regents has taken administrative review to this court (Ill. Rev. Stat. 1985, ch. 48, par. 1716(a); 107 Ill. 2d R. 335(a)). We have allowed the Board of Trustees of the University of Illinois and the Board of Trustees of Southern Illinois University to file a joint brief *amicus curiae* in support of the Board of Regents on one of the issues presented. We affirm the certification but reverse a portion of the order of April 17, 1987, concerning challenges to ballots.

After the filing of the petitions, the parties entered into stipulations which resolved many questions as to who was in the proposed bargaining unit at SSU and would thereby be eligible to vote at the election. The parties agreed to defer determining the status of four directors of four public affairs centers at SSU. After conducting hearings during the months of September through December 1984, a hearing officer for IELRB issued a recommended decision and order of election on July 15, 1985. On May 30, 1986, IELRB issued an opinion and order setting forth the makeup of the bargaining unit at the various institutions and ordering that an election be held. *Board of Regents of State of Illinois*, 2 Pub. Employee Rep. (Ill.) par. 1069, case Nos. 84—0008, 84—0012 (Illinois Educational Labor Relations Board, May 30, 1986).

By the terms of section 8 of the Act (Ill. Rev. Stat. 1985, ch. 48, par. 1708), the ballot at the election gave the voters at SSU the opportunity to vote for either (1) representation by UPI, (2) representation by AAUP, or (3) no representation. At SSU, 144 ballots were cast, seven of which were challenged. The tally of the remaining 137 ballots was as follows:

| | |
|---|---|
| For UPI | 69 |
| For no representation | 54 |
| For AAUP | 14 |

For a choice to prevail, section 8 requires a labor organization to receive the vote of a majority of the ballots cast. As the 69 votes for UPI was not a majority of the 144 possible votes, the ruling in regard to the seven challenged ballots is dispositive of the outcome of the election.

The IELRB order of April 17, 1987, sustained the challenge to four of the ballots and overruled the challenge to three of them. The propriety of the ruling sustaining the challenge to three of the ballots is not disputed. The fourth ballot, to which the challenge was sustained, was that of Barbara Hartman. That ruling is one of the issues on review. One of the directors of the public affairs centers did not vote. The other three ballots in issue are those of the other three center directors, who voted under an agreement that their ballots be withheld from the original count. The other issue in the case is IELRB's ruling permitting these ballots to be counted.

Our resolution of the two issues could have four possible results, only one of which could possibly change the result of the election. In its order of April 17, 1987, ruling on the challenges, IELRB ordered the ballots cast by the center directors to be opened. The count was two votes for UPI and one for no representation. If we hold, as IELRB requests, that the directors' ballots should be counted but Hartman's should not, UPI would have 71 votes out of 140 cast and a majority. If we hold that both the center directors' and Hartman's ballots are to be counted, UPI would have at least 71 votes out of 141, which would still be a majority. If we hold, as the Board of Regents requests, that the center directors' votes should not count but Hartman's should count, UPI would have only a certain 69 votes out of 138. Thus, Hartman's vote would be crucial. If she voted for UPI, it would prevail. If she voted for another choice, no majority would exist, and a runoff election would be required. Ill. Rev. Stat. 1985, ch. 48, par. 1708.

We find a fourth alternative to be the proper disposition. We hold IELRB properly sustained the challenge to Hartman's ballot but improperly permitted the vote of the three center directors. Thus, the original count, by which UPI received 69 of 138 votes and a majority, prevails. Accordingly, the IELRB correctly certified UPI as the exclusive collective-bargaining representative for the SSU unit.

■ We consider first the question of the Hartman ballot. The Board of Regents had originally objected to Hartman's voting but, apparently, withdrew its challenge after she had voted, whereupon UPI challenged the ballot. We do not agree with the Board of Regents that UPI's challenge was untimely. When one party changes its position on

a matter, fairness ordinarily requires an adverse party to have an opportunity to also do so. Accordingly, we will determine the question on its merits.

The IELRB determination on the Hartman ballot was based upon the combined effect of the IELRB rules and the parties' stipulation as to the makeup of the proposed bargaining unit. In order to be eligible to vote in an election regarding selection of an exclusive bargaining representative, IELRB rules require an employee to not only be in an eligible position for the payroll period immediately prior to the election but also to have been in an eligible position during the payroll period immediately prior to the order directing the holding of the election. (80 Ill. Adm. Code 1110.130(a) (1985).) The parties here had stipulated that "[f]ull time tenured or tenure-track faculty should be included" in the bargaining unit and that "full time" is defined as "an employee who has an appointment of .50 or more."

Undisputedly, for the payroll period immediately before the election, Hartman had a full-time appointment as an associate professor of Human Development Counseling. However, for the university year from July 1, 1985, to June 30, 1986, which included the payroll period before the order of May 30, 1986 (*Board of Regents of State of Illinois*, 2 Pub. Employee Rep. (Ill.) par. 1069, case Nos. 84—0008, 84—0012 (Illinois Educational Labor Relations Board, May 30, 1986)), directing that an election be held, she held a position described in her contract as "Faculty Associate to the [Vice-President for Academic Affairs] for Graduate Studies and Associate Professor of Human Development Counseling." The record is clear that Hartman was directed to spend approximately two-thirds of her time as a faculty associate and one-third of her time as an associate professor. In its order of April 17, 1987, IELRB determined that although Hartman was in a tenure-track position in the 1985-86 university year, she did not have a "faculty appointment" for 50% of her work. Thus, IELRB held Hartman failed to meet one of the requirements for voting in the election.

■ The Board of Regents asks us to reject the validity of the IELRB rule which requires the employee to have been an eligible voter during the payroll period immediately preceding the order directing the election, whereas here, the order was entered on May 30, and the election was not held until the following October 1. (80 Ill. Adm. Code 1110.130(a) (1985).) The Board of Regents asserts the long time span renders the rule arbitrary and unreasonable. We disagree. The rule serves the purpose of inhibiting any side of such a contested issue from affecting the makeup of the voting body after the election is directed.

■■ The hearing officer described the parties' stipulation in her recommended decision and order of July 15, 1985. She also stated in that document the personnel in the bargaining unit at SSU should include "[a]ll full-time *professional* personnel (*i.e.*, employees having appointments of .50 or more) employed in tenured and *tenure-track* positions" excluding supervisors, managerial employees and confidential employees. (Emphasis added.) The subsequent IELRB order of May 30, 1986 (*Board of Regents of State of Illinois*, 2 Pub. Employee Rep. (Ill.) par. 1069, case Nos. 84—0008, 84—0012 (Illinois Educational Labor Relations Board, May 30, 1986)), approved the hearing officer's report in regard to all SSU positions. Thus, as Hartman was a professional employee working full time for SSU and on tenure-track in the period preceding May 30, 1986, some uncertainty is created as to whether she was eligible at that time under the stipulation. The Board of Regents contends she was on the faculty then and had a full-time appointment but had two assignments to perform.

We recognize some ambiguity as to the nature of Hartman's status. Under the hearing officer's recommendation, apparently adopted by IELRB in its order of May 30, 1986 (*Board of Regents of State of Illinois*, 2 Pub. Employee Rep. (Ill.) par. 1069, case Nos. 84—0008, 84—0012 (Illinois Educational Labor Relations Board, May 30, 1986)), "full time professional personnel" who were in "tenure-track positions" were intended to be in the bargaining unit. Hartman was a full-time professional working for SSU and was in a tenure-track position. Other persons holding positions in the same dual capacity as did Hartman in the 1985-86 university year were stipulated to be in the bargaining unit. Consistency is desirable, but we know of no rule which superimposes on such a stipulation that all other persons in similar positions to the subjects of the stipulation should be treated the same. Such a rule would be an undesirable detriment to the desirable practice of reducing issues by stipulation. However, we do not agree with IELRB's conclusion that the fact Hartman was not included in the stipulation gives rise to any inference that she did not meet the dual-eligibility requirement of the IELRB rule. The indication from the record is that her right to vote was disputed at the time of the stipulation for another reason.

The parties' stipulation used the words "full-time tenured or tenured-track faculty." After giving full consideration to the argument of the Board of Regents that a person could be full-time faculty with an assignment to spend over one-half of that person's time in a nonteaching position, we conclude the decision of IELRB that Hartman was not "full-time *** faculty" in the 1985-86 university year is neither

arbitrary nor capricious, and that the determination of any factual question involved is not contrary to the manifest weight of the evidence. *Murdy v. Edgar* (1984), 103 Ill. 2d 384, 469 N.E.2d 1085.

Although our decision as to Hartman's eligibility is dispositive of the outcome of the election and thus as to the certification of UPI, we deem it necessary for us to also decide the other issue presented. The determination of the propriety of counting the center directors' ballots also determines whether they are properly in the bargaining unit for other purposes in a manner binding on the parties. Additionally, we note that four years have now elapsed since the filing of the petition in this case. If higher review is granted, our decision on the status of the center directors should be available. Otherwise, a higher court holding us to have been wrong on our decision as to Hartman might deem it appropriate to remand to us for our decision on the issue concerning those directors. That would further delay a final determination of the case.

The evidence at the hearing before the hearing officer in regard to the challenges to various ballots showed that to effectuate its stated purpose as a "public affairs institution," SSU established the following public affairs centers: Center for Community and Regional Studies; Center for Legal Studies; Center for Policy Studies and Program Evaluation; and the Illinois Legislative Studies Center. Each center is charged with the development of applied research and service activities which address problems of State and local significance in their respective areas. Each center is staffed by a director, an assistant to the director, one or more clerical employees and full-time faculty who are associated with SSU academic programs on a half-time basis while spending the rest of their time with the center. The directors whose status is at issue are listed as "faculty" rather than "administrators" in the SSU catalog, as are the SSU president, the vice-president for academic affairs and seven deans. Each director is considered tenured faculty in his or her academic program, and each is considered eligible for promotion while serving as a center director. However, unlike most other faculty, the director's position is considered to be an administrative one, exempt from the Universities Civil Service Systems.

Section 3 of the Act gives "educational employees" the right to organize for purposes of collective bargaining (Ill. Rev. Stat. 1985, ch. 48, par. 1703). Section 2(b) of the Act defines an "educational employee" as an employee of an "educational employer" with certain exceptions which include supervisors, managerial or confidential employees and others not significant here. (Ill. Rev. Stat. 1985, ch. 48, par.

1702(b)).) Section 2(*o*) of the Act defines "managerial employee" as:

> "[A]n individual who is engaged predominantly in executive and management functions and is charged with the responsibility of directing the effectuation of such management policies and practices." (Ill. Rev. Stat. 1985, ch. 48, par. 1702(*o*).)

The Board of Regents maintains IELRB erred in determining that the center directors at SSU are not "managerial employees" and IELRB erred in permitting three of them to vote.

In its order of April 17, 1987, formalized by the order of August 5, 1987 (*Board of Regents of State of Illinois,* 3 Pub. Employee Rep. (Ill.) par. 1098, case Nos. 84—0008, 84—0012 (Illinois Educational Labor Relations Board, Aug. 5, 1987)), denying the challenges to the ballots of the three center directors, IELRB made the following findings as to the duties and responsibilities of those directors. Each was responsible for the day-to-day operation of the centers, but the dean of the school in which the center was located was responsible for its overall supervision. The directors were responsible for describing the mission of the centers and to work with the center faculty and the administration to establish goals and policies. Directors have been able to change the focus of a center, but a major change would require approval of the Illinois Board of Higher Education. The directors had the responsibility to make recommendations as to the staffing of the faculty and to seek faculty to fill those positions.

The duties, responsibilities, and method of operation of the directors were further described by IELRB in the following way. The director ordinarily negotiates with a prospective faculty member over the nature of the program which the faculty person would be engaged in, determining whether the program fits with the goals and functions of the center, and whether it justifies the cost. After those negotiations, the director would aid the faculty member in preparing a written proposal to be submitted to the appropriate dean for approval and submission to higher SSU authority. The director had the power to refuse a faculty appointment to the center. If a faculty member is accepted, the director then monitors that person's work, receives a report from him at the end of each semester and then comments upon or approves the report and submits it to the dean. The director also supervised all faculty personnel of the center. However, the assistants to the directors had more interaction with the support staff than did the director.

Findings were also made by IELRB in regard to the financial responsibility of the center directors, which they assessed as hereafter stated. If a project required a grant, the director would solicit the

grant. If the proposal came from outside the center personnel, the director would pass upon the desirability of the proposal, and if the proposal were deemed desirable, negotiate the terms of the grant. The director would also seek to match the proposed project with an appropriate faculty member and then seek higher approval, usually from the appropriate dean. Some fiscal responsibility could be delegated to the person in charge of the project. The director had the responsibility to determine the overhead expense of the project for which SSU should be reimbursed. Most of the money involved in the projects concerned salary, but the director had the responsibility of passing upon the propriety of such expenditures as those for travel. The amount of those expenditures over which the director had direct concern were not large.

In its order of April 17, 1987, formalized by its document of August 5, 1987, IELRB found the center directors were not "managerial employees" under the standards expressed by it previously. It noted that the center directors do not "exercise substantial and continuing independent authority over relatively crucial aspects of SSU's operation which have the potential to affect the wages, hours, terms and conditions of employment of significant numbers of SSU faculty." (*Board of Regents of State of Illinois*, 3 Pub. Employee Rep. (Ill.) par. 1098, case Nos. 84—0008, 84—0012 (Illinois Educational Labor Relations Board, Aug. 5, 1987).) In addition, the IELRB found the directors' authority over the day-to-day operations is restricted by other entities, and their authority over personnel is substantially "diffused" through the entire faculty in the process of faculty self-governance. Finally, the IELRB concluded that, because the directors share a "community of interest" with other SSU faculty, retain their rank as tenured faculty in academic programs, and spend much of their employment time performing duties similar to those of other faculty, the center directors are appropriately included in the same bargaining unit as the other SSU faculty.

Discussion of the application of the managerial exclusion to the situation of the center directors must include consideration of the decision of the United States Supreme Court in *NLRB v. Yeshiva University* (1980), 444 U.S. 672, 63 L. Ed. 2d 115, 100 S. Ct. 856. There, the court held that a judicially imposed exclusion of managerial employees from those having a right to organize under the terms of the Labor Management Relations Act (LMRA) (29 U.S.C. §151 *et seq.* (1982); *NLRB v. Bell Aerospace Co.* (1974), 416 U.S. 267, 40 L. Ed. 2d 134, 94 S. Ct. 1757) prevented faculty at a private university from having that right. The court concluded the collegial nature of that in-

stitution diffused the governing power to such an extent that faculty were managerial. See also *In re Boston University* (1986), 281 N.L.R.B. 115, 123 L.R.R.M. 1144, *dismissal of unfair labor practice charges aff'd and petition for review denied sub nom. Boston University Chapter AAUP v. NLRB* (1st Cir. 1987), 835 F.2d 399, 127 L.R.R.M. 2193.

Clearly, the legislature did not intend to exclude a college faculty member at a public institution from being an "educational employee" within the meaning of section 2(b) of the Act (Ill. Rev. Stat. 1985, ch. 48, par. 1702(b)). The question then becomes the extent to which the concept of the managerial exception under the Act differs from that under LMRA.

One of the reasons IELRB held the center directors did not come within the managerial exception was because they did not exercise authority over aspects of SSU's operation "which have the potential to affect wages, hours, and terms and conditions of employment of significant numbers of SSU faculty." This factor has been referred to throughout this dispute and in other cases as the "labor nexus." In a footnote to the order and opinion, IELRB stated that this requirement was a concept which was broader and different from the "labor nexus" tests arising under the LMRA. The opinion and order indicated the concept would receive elaboration in subsequent cases. We find no substantial basis for application to the managerial exclusion of a "labor nexus" test or of the type of test apparently contemplated by IELRB.

The *Bell Aerospace* Court concluded that in order for an employee to be subject to the managerial exclusion, the employee need not be in a position "susceptible to conflicts of interest in labor relations." (*Bell Aerospace*, 416 U.S. at 274, 40 L. Ed. 2d at 142, 94 S. Ct. at 1761-62.) The managerial exclusion became a part of the Act (Pub. Act 83—1014) because of the amendatory veto of Governor James R. Thompson. (Governor's amendatory veto, September 23, 1983, Public Act 83—1014 (1983 Ill. Laws 6870, 6898).) That amendatory veto also created an exclusion for employees who are "confidential." Section 2(n) of the Act describes "confidential" employees as (1) "persons who formulate, determine and effectuate management *policies with regard to labor relations*," or (2) those who have access, in the regular course of duties "to information relating to the effectuation or review of the employer's collective bargaining policies." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 48, par. 1702(n).

▪ ■ Thus, the traditional concept of the management exclusion did not include a "labor nexus" test or a more expanded test derived

therefrom. The Governor's amendatory veto in creating the managerial and "confidential" exclusions expressly provided for a labor-nexus test in the latter but not the former. The rule of *Bell Aerospace* strongly indicates an intention that the tests not be applicable to the managerial exclusion. We see no reason why use of such tests are necessary or desirable to distinguish the treatment of faculty intended by the Act from the treatment given to faculty under *Yeshiva*. No satisfactory argument has been made to us to require a *labor nexus* or a more expanded concept based thereon. We cannot give any deference to an expanded test, when neither the extent of the concept nor the reasons for it are explained by the agency. (*Oil, Chemical & Atomic Workers v. NLRB* (D.C. Cir. 1986), 806 F.2d 269.) Accordingly, we hold that the managerial exclusion of the Act is not subject to such a test.

■ We also disagree with the holding by IELRB that the managerial exclusion is applicable only to those "who exercise substantial and continuing independent authority over crucial aspects of SSU's operation." The IELRB's reason for the interpretation is the statement of then Senator Terry L. Bruce, a principal sponsor of the Act, made on the Senate floor during consideration of the Governor's amendatory veto. He stated that the term "managerial employee" refers to "very limited people who are central management, at the very highest level." This was clearly not the traditional interpretation given to the managerial exception, and if such a limited interpretation were intended, the amendatory language would be apt to so state.

The limited nature of the "confidential" exception is carefully spelled out in section 2(n) of the Act. Similar specificity would likely have been used in defining the term "managerial employee" in section 2(*o*) of the Act if the limited applicability found by IELRB were intended. We recognize that if the definition given in section 2(*o*) is ambiguous, extrinsic aids to determine its meaning would be appropriate. (*Department of Public Works & Buildings v. Schon* (1969), 42 Ill. 2d 537, 250 N.E.2d 135.) Under those circumstances, one such aid would be a comment made in debate by a sponsor of the bill. (*Spinelli v. Immanuel Evangelical Lutheran Congregation, Inc.* (1986), 144 Ill. App. 3d 325, 494 N.E.2d 196, *aff'd* (1987), 118 Ill. 2d 389, 515 N.E.2d 1222.) However, if that rule were to be applied here, the weight given to the sponsor's comments would be lessened, because the language involved is not that of the bill's sponsors but that of the Governor in his amendatory veto.

We also recognize that IELRB made a similar interpretation giving a narrow construction to the managerial exclusion in *Niles Town-*

*ship High School District No. 219*, 2 Pub. Employee Rep. (Ill.) par. 1033, case No. 85—RC—0017—C (Illinois Educational Labor Relations Board, Jan. 29, 1986). While that ruling is entitled to some deference, a decision of an administrative agency on a matter of statutory interpretation is not nearly as persuasive as a long-standing interpretation not judicially rejected. We are unpersuaded that the managerial exclusion is limited to very high positions and hold that it is not.

The IELRB findings show the center directors performed many managerial functions. They had the responsibility for the day-to-day operation of the centers. The directors had the responsibility to seek personnel including faculty for the center and absolute power to reject any faculty person from work at the center. Seeking grants and projects was another responsibility. They negotiated on behalf of SSU with outsiders and faculty over the shape and focus of projects and had the responsibility to see that the projects were within the objectives and capabilities of the center. As with personnel, they had absolute power to reject a project. Although they worked with faculty and other administrative personnel in determining the nature of the functions of the center, on occasion they had been able to change the focus of a center. A major portion of their function was to match the available faculty to the types of projects desired and to shape the project to the funds and personnel available. Once a project was designed and approved, the directors monitored the project.

In its order of May 30, 1986 (*Board of Regents of State of Illinois*, 2 Pub. Employee Rep. (Ill.) par. 1069, case Nos. 84—0008, 84—0012 (Illinois Educational Labor Relations Board, May 30, 1986)), defining the makeup of the proposed bargaining units, IELRB rejected a recommendation of the hearing officer that the department chairs at the other universities involved should be excluded because they were both supervisory and managerial. One of the reasons given for this rejection was that a major function of the chairs was to represent the faculty and its concerns at the higher level of administration. Here, the function of the center directors appears to be to represent the higher administration in negotiating and otherwise dealing with the faculty and the public.

We conclude the duties and responsibilities of the center directors are more managerial than those of the faculty at the collegially governed Yeshiva University (*Yeshiva*, 444 U.S. 672, 63 L. Ed. 2d 115, 100 S. Ct. 856). Neither the Act's admitted rejection of the *Yeshiva* principle, nor the diffusion of governing authority practiced by many institutions of higher learning giving managerial status to ordinary faculty require or indicate a conclusion that persons direct-

ing the operation of centers, of the nature involved here, are not acting in a managerial or executive way within the meaning of the Act. We agree with the IELRB determination that center directors "share a community of interest with other faculty." However, we also conclude their duties and responsibilities are such that they should not be in a position requiring them to divide their loyalty to the administration of SSU with their loyalty to an exclusive collective-bargaining representative. See *Yeshiva*, 444 U.S. at 687-88, 63 L. Ed. 2d at 129, 100 S. Ct. at 865.

In his amendatory veto message in regard to the Act, Governor Thompson referred to changes which would balance "the rights of educational employees with the unique managerial problems that beset educational employers and the taxpayers who ultimately pay the bill." (Governor's amendatory veto message, September 23, 1983.) An interpretation of the managerial exclusion which does not include ordinary college faculty members, regardless of the diffused collegial nature of the governance of the institution, but which does include persons exercising the managerial and executive functions of directors of programs such as the centers, would seem to most nearly meet the intent of that message.

Because the center directors had half-time faculty appointments, the evidence is close as to whether they spend a sufficient portion of their time in that capacity to be "engaged predominately in executive and management functions." No finding was made by IELRB in this regard, and this issue was not considered by IELRB in reaching its decision. If the directors are not distinguished from the assistant directors because of their failure to be engaged in management functions for a sufficient amount of time, the determination that the center directors are not subject to exclusion is inconsistent with the parties' stipulation that the assistant directors at the center were subject to exclusion. However, as we have stated in connection with the rejection of the ballot of Hartman, we know of no rule which requires a tribunal to determine contested issues in a way that is consistent with stipulations that have been made in regard to other issues.

We hold the center directors were subject to the managerial exclusion as a matter of law.

■ Finally, we consider a question which has not been raised by the parties. However, we have responsibility to consider *sua sponte* whether we have jurisdiction. (*Clark v. State Police Merit Board* (1972), 5 Ill. App. 3d 332, 282 N.E.2d 220.) The precise question is whether the order of April 20, 1987, certifying UPI as the exclusive collective-bargaining representative, has sufficient finality to be ap-

pealable. Concern with whether orders other than those in regard to an unfair labor practice are appealable under the Illinois Public Labor Relations Act (Ill. Rev. Stat. 1985, ch. 48, par. 1601 *et seq.*) has been expressed in *City of Wood Dale v. Illinois State Labor Relations Board* (1988), 165 Ill. App. 3d 640, and *Laborer's International Union of North America, Local 1280 v. Illinois State Labor Relations Board* (1987), 154 Ill. App. 3d 1045, 507 N.E.2d 1200.

Under the LMRA, orders certifying the election of exclusive collective-bargaining representatives have been held to lack the finality to make them subject to administrative review. (*American Federation of Labor v. NLRB* (1940), 308 U.S. 401, 84 L. Ed. 347, 60 S. Ct. 300; *NLRB v. Falk Corp.* (1940), 308 U.S. 453, 84 L. Ed. 396, 60 S. Ct. 307.) Under such a rule, a party wishing to challenge the propriety of the election or certification must defy the certification, usually by refusing to bargain, and subject itself to an unfair labor practice charge.

At times pertinent here, the only provision under the Act to obtain administrative review was section 16. (Ill. Rev. Stat. 1985, ch. 48, par. 1716.) It is entitled "Judicial review" and states in subsection (a) that "[a] charging party or any person aggrieved by a *final order* of the Board granting or denying in whole or in part the relief sought" may obtain review under the Administrative Review Law with the appeal taken to the appellate court. (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 48, par. 1716(a).) The other subsections of section 16 concerns the obtaining of judicial enforcement of IELRB orders in the circuit court. The language of section 16 appears unequivocally to make any final order of IELRB subject to administrative review. Despite the precedent to the contrary, an order certifying a collective-bargaining agent would appear to conclude a proceeding and be final, and a procedure to enforce the certification would appear to be a new proceeding.

Even if the precedent for denying administrative review of an order of certification is deemed to make the administrative review provisions of section 16 ambiguous, that ambiguity should be resolved in favor of holding the order of certification final and subject to administrative review. While an amendment to an unambiguous statute indicates an intent to change the law, amendment to an ambiguous statute can be interpreted as intending to clarify that ambiguity. (*O'Connor v. A & P Enterprises* (1980), 81 Ill. 2d 260, 272, 408 N.E.2d 204, 209; *People v. Scott* (1974), 57 Ill. 2d 353, 312 N.E.2d 596.) Effective July 1, 1988, section 7(d) has been added to the Act to expressly provide that an order of IELRB (1) certifying the election

of a labor organization as the exclusive bargaining representative of a unit, or (2) certifying that a union has not been so elected, is a final order appealable under the Administrative Review Law (Pub. Act 85—924, eff. July 1, 1988 (amending Ill. Rev. Stat. 1985, ch. 48, par. 1707).) While the foregoing amendment to the Act had many other amendments to various statutes, we deem the foregoing provision to clarify an ambiguity as to whether the order involved here was intended to be subject to administrative review.

We hold the order of August 5, 1987 (*Board of Regents of State of Illinois*, 3 Pub. Employee Rep. (Ill.) par. 1098, case Nos. 84—0008, 84—0012 (Illinois Educational Labor Relations Board, Aug. 5, 1987)), to be final and subject to administrative review by this court.

We affirm the order of April 20, 1987, certifying UPI as the exclusive collective-bargaining representative of the unit designated and all portions of the underlying order, except we reverse the portion of the order determining the center directors were properly in the designated proposed bargaining unit and had a right to vote in the election of October 1, 1986.

Affirmed in part; reversed in part.

McCULLOUGH and SPITZ, JJ., concur.