672 A.2d 1244

IN THE MATTER OF NEW JERSEY TURNPIKE AUTHORITY, APPELLANT, v. AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, COUNCIL 73, RESPONDENT.

NEW JERSEY TURNPIKE AUTHORITY, APPELLANT, v. AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, COUNCIL 73, LOCALS 3912 AND 3913, RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Submitted February 20, 1996—Decided March 20, 1996.

Before Judges HAVEY, D'ANNUNZIO and CONLEY.

*Schwartz, Tobia & Stanziale,* attorneys for appellant in A–1646–93T5 (*Frank R. Campisano* and *Joseph M. Campisano,* on the brief).

*Riker, Danzig, Scherer, Hyland & Perretti,* attorneys for appellant in A–1302–94T5 (*Michael K. Furey* and *James P. Anelli,* on the brief).

*Weissman & Mintz,* attorneys for respondents in both appeals (*Steven P. Weissman,* on the briefs).

*Robert E. Anderson,* General Counsel, attorney for respondent Public Employment Relations Commission (*Mr. Anderson,* on the brief).

*Deborah T. Poritz,* Attorney General, attorney for *Amicus Curiae* State of New Jersey in A–1646–93T5 (*Mary C. Jacobson,* Assistant Attorney General, of counsel; *Michael L. Diller, Sr.,* Deputy Attorney General, and *Carol Johnston,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

CONLEY, J.A.D.

These consolidated appeals involve determinations by the Public Employment Relations Commission (PERC) certifying three separate collective negotiations units within the New Jersey Turnpike Authority (Authority) and in doing so rejecting, for almost all of the positions involved, the Authority's contention that the affected employees are either "managerial executives" or "confidential employees" as defined in *N.J.S.A.* 34:13A–3(f) and (g). The units comprise those employees who occupy upper and middle level management positions within the Authority's hierarchical structure.

At the time of the PERC decisions, the Authority, governed by the board of commissioners and their executive director, operated through nine departments. As described by the Hearing Officer, the chief engineer reports directly to the executive director on behalf of four of the departments. The other five departments are managed by directors and the comptroller, who also report directly to the executive director. As we understand it, these positions are not involved in this appeal. It is the management level below these positions for which certification was sought and those positions consist of section managers, assistant managers and professionals. Compared to the approximately 2,200 public employees

employed by the Authority, the upper and middle level managerial team within the Authority's structure consists of approximately 100 employees. The practical effect of PERC's decisions is to leave the Authority with only twenty members of its management team from whom it can expect full loyalty uncompromised by union membership.[1]

██ We acknowledge at the outset that ordinarily we defer to an agency's interpretation of a statute that it is charged with enforcing. No such deference, however is required where the interpretation "flout[s] the statutory language and undermine[s] the intent of the Legislature." *GE Solid State, Inc. v. Director, Div. of Taxation,* 132 *N.J.* 298, 306–07, 625 *A.*2d 468 (1993). As defined in *N.J.S.A.* 34:13A–3(f), "managerial executives" are "persons who formulate management policies and practices, and persons who are charged with the responsibility of directing the effectuation of such management policies and practices. . . ." We believe that in concluding that most of the affected management employees here were not "managerial executives," PERC misconstrued the Legislature's intent and the plain statutory meaning of that term. As defined in *N.J.S.A.* 34:13A–3(g), "confidential employees" as employees "whose functional responsibilities or knowledge in connection with the issues involved in the collective negotiations process would make their membership in any appropriate negotiations incompatible with their official duties." We are also convinced that PERC similarly has misconstrued and misapplied the "confidential employee" definition to the facts presented to it. We thus remand the entire matter to PERC for a comprehensive reconsideration consistent with this opinion. As a result of our conclusion to do so, we do not discuss in detail either the procedural history or the extensive facts applicable to each of the affected employees. Rather, we focus our attention upon the two critical statutory exceptions.

---

[1] These numbers are taken from the Authority's brief in A–1302–94T5. They are not disputed by respondents.

I

█ We begin our analysis with some general observations. It is true, as asserted by respondents, that the New Jersey Constitution grants to public employees the right to organize, present, and make known to their public employers their grievances and proposals through representatives of their own choosing. *N.J. Const.* art. I, ¶ 19. That right has been codified by the New Jersey Employer–Employee Relations Act, *N.J.S.A.* 34:13A–1 to –29 (the Act), which, it has been said, is remedial. *Galloway Tp. Bd. of Educ. v. Galloway Tp. Ass'n of Educ. Secretaries*, 78 *N.J.* 1, 15, 393 *A.2d* 207 (1978). The right to negotiate in the public sector, however, is not unlimited. It is more narrow than the right to bargain that is accorded private employees, *Lullo v. Int'l Ass'n of Fire Fighters*, 55 *N.J.* 409, 415, 262 *A.2d* 681 (1970), and is further limited by the fundamental differences between private employers and public employers in the context of labor relations. *E.g.*, *Ridgefield Park Educ. Ass'n v. Ridgefield Park Bd. of Educ.*, 78 *N.J.* 144, 163, 393 *A.2d* 278 (1978); *Lullo, supra*, 55 *N.J.* at 440, 262 *A.2d* 681; *Rutgers, The State Univ. v. Rutgers Council of AAUP Chapters*, 256 *N.J.Super.* 104, 114–15, 606 *A.2d* 822 (App. Div.1992), *aff'd o.b.*, 131 *N.J.* 118, 618 *A.2d* 853 (1993). *And see State v. Professional Ass'n of N.J., Dept. of Educ.*, 64 *N.J.* 231, 242–43, 315 *A.2d* 1 (1974) ("[t]here are several clues to a supervening legislative policy underlying [the Act] that the peculiar needs, requirements and interests of the general public and of government as an employer should be accorded attention coordinate with that of employee rights in the interpretation and administration of the [A]ct." *Id.* at 242, 315 *A.2d* 1).

Even in the private sector, one of the overriding and limiting concerns affecting who may sit on the other side of the bargaining table with the employer has been the thought that part of the objective of the federal labor law " 'was to assure the employer of a loyal and efficient cadre of supervisors and managers independent from the rank and file.' " *State Management Ass'n of Conn., Inc. v. O'Neill*, 204 *Conn.* 746, 754, 529 *A.2d* 1276, 1280 (1987)

(quoting *Shelofsky v. Helsby*, 32 *N.Y.*2d 54, 60–62, 295 *N.E.*2d 774, 776, 343 *N.Y.S.*2d 98, 102, *appeal dismissed*, 414 *U.S.* 804, 94 *S.Ct.* 60, 38 *L.Ed.*2d 41 (1973)). *And see NLRB v. Yeshiva Univ.*, 444 *U.S.* 672, 682, 100 *S.Ct.* 856, 862, 63 *L.Ed.*2d 115, 125 (1980) (the key concern underlying the managerial exclusion in the federal labor law is "[t]hat an employer is entitled to the undivided loyalty of its representatives."); *NLRB v. Bell Aerospace Co.*, 416 *U.S.* 267, 278–79, 94 *S.Ct.* 1757, 1764, 40 *L.Ed.*2d 134, 145 (1974) (to allow managers to be union members would " 'obliterate the line between management and labor.' " . . . . [T]he federal labor law was "intended to protect 'laborers' and 'workers' whose right to organize and bargain collectively had not been recognized by industry, resulting in strikes, strife, and unrest. By contrast, there was no similar history with respect to foremen, managers, superintendents, or vice-presidents.").

This concern, it has been said, applies as well to the public sector. *State Management Ass'n of Conn., Inc. v. O'Neill, supra,* 204 *Conn.* at 754, 529 *A.*2d at 1280; *Shelofsky v. Helsby, supra,* 32 *N.Y.*2d at 61, 295 *N.E.*2d at 774, 343 *N.Y.S.*2d at 98. *And see Board of Regents of the Regency Univs. Sys. v. Illinois Educ. Labor Relations Bd.*, 166 *Ill.App.*3d 730, 742–43, 117 *Ill.Dec.* 799, 807, 520 *N.E.*2d 1150, 1158 (App.Ct.1988); *Missouri Nat'l Educ. Ass'n v. Missouri State Bd. of Mediation*, 695 *S.W.*2d 894, 897–98 (Mo.1985) ("[i]n the course of labor relations, someone must act on behalf of the public employer ... [a]mong the categories of employees whose duties involve acting directly or indirectly in the interest of the employer in relation to other employees are 'managerial' employees and 'confidential' employees."). *Cf. Board of Educ. of West·Orange v. Wilton*, 57 *N.J.* 404, 425, 273 *A.*2d 44 (1971) ("[o]ne underlying concept which emerges from a study of statutes, texts and judicial decisions in employer-employee relations, whether in the public or private employment sector, is that representatives of the employer and the employees cannot sit on both sides of the negotiating table. Good faith negotiating requires that there be two parties confronting each other on opposite sides of the table. Obviously both employer and employee

organizations need the undivided loyalty of their representatives and their members, if fair and equitable settlement of problems is to be accomplished.").

We reject respondent's contention that these concerns were not considered in the 1974 amendments to the Act, which, for the first time, defined managerial executives and confidential employees, both of whom are excluded from the representational rights of public employees. *N.J.S.A.* 34:13A–5.3. Concerns of similar nature were recognized in the 1968 Act. *State v. Professional Ass'n of N.J., Dept. of Educ., supra,* 64 *N.J.* at 242–243, 315 *A.*2d 1. There is nothing in the legislative history applicable to the 1974 amendments that we read to demonstrate a different approach. Specifically, we reject the argument that the 1974 amendments reflect a narrow view of those two categories of employees deemed to be so aligned with management as to make their inclusion in a bargaining unit antithetical to public sector principles thus far espoused in this State.

## II

The 1968 Act (Chapter 303) defined "employee" to exclude "elected officials, heads and deputy heads of departments and agencies, and members of boards and commissions...." *L.*1968, c. 303, § 4 (codified at *N.J.S.A.* 34:13A–3(d)). Additionally, *N.J.S.A.* 34:13A–5.3, excluded "any managerial executive" from the right to representative negotiations. "Managerial executive," however, was not defined in Chapter 303.

In contrast, supervisors, who were accorded the right to collectively negotiate, were referred to as "having the power to hire, discharge, discipline, or to effectively recommend the same...." *See N.J.S.A.* 34:13A–5.3. Such supervisors, we think, refer to those persons commonly understood as on-line supervisors.

In 1972, the Legislature attempted to amend Chapter 303 by enacting Assembly Bill No. 520 to include provisions for unfair labor practice. In former Governor Cahill's veto of this bill, he proposed a broader revision of Chapter 303. In part, he recom-

mended that supervisors be excluded from the definition of public employee. The Governor also proposed defining those employees to be excluded as supervisors broadly as "any individual having authority, in the interest of the public employer, to hire, transfer, suspend, layoff, recall, evaluate, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." *Governor's Veto Statement,* A. 520 (1973). *See* 29 *U.S.C.A.* § 152(11). *And compare State Management Ass'n of Conn. v. O'Neill,* 40 *Conn.Supp.* 381, 390, 512 *A.*2d 240, 246 (Super.Ct.1986), *aff'd,* 204 *Conn.* 746, 529 *A.*2d 1276 (1987) (under a broader definition of supervisor [2] than contained in the Act, "[s]upervisors supervise the work of subordinates; managers head an agency subunit or facility. Supervisors apply agency policies; managers formulate those policies. Supervisors enforce collective bargaining agreements; managers play a major role in administering them. Supervisors establish and implement employee performance standards; managers decide major personnel decisions").

---

[2] As defined in *Conn.Gen.Stat.* 5-270(f) "supervisory employee" means:

any individual in a position in which the principal functions are characterized by not fewer than two of the following: (1) Performing such management control duties as scheduling, assigning, overseeing and reviewing the work of subordinate employees; (2) performing such duties as are distinct and dissimilar from those performed by the employees supervised; (3) exercising judgment in adjusting grievances, applying other established personnel policies and procedures and in enforcing the provisions of a collective bargaining agreement; and (4) establishing or participating in the establishment of performance standards for subordinate employees and taking corrective measures to implement those standards, provided in connection with any of the foregoing the exercise of such authority is not merely of a routine or clerical nature, but requires the use of independent judgment, and such individuals shall be employees within the meaning of subsection (b) of this section. The above criteria for supervisory positions shall not necessarily apply to police or fire departments.

When the Legislature finally amended Chapter 303 in 1974 by passing Senate Bill No. 1087, it did not accept the Governor's recommendation that supervisors be excluded. *See N.J.S.A.* 34:13A–5.3. But, significantly, neither did it more broadly define those supervisors who may organize and collectively negotiate, beyond those who have the power to hire, discharge, discipline, or recommend the same—*i.e.*, on-line supervisors.

We consider what the Legislature did do, however, with respect to managerial executives. And we do so within the context of the then general understanding of who are management employees and PERC's more restrictive pre Chapter 303/post 1974 amendment interpretation of such employees. As we have said, Chapter 303, though excluding such managers from the negotiations process, did not define who they were. In the private sector, such employees [3] have been defined as those who "formulate and effectuate management policies by expressing and making operative the decisions of their employer[s]" and who "exercise discretion within, or even independently of, established employer policy," such that they are "aligned with management." *NLRB v. Yeshiva Univ., supra,* 444 *U.S.* at 682–83, 100 *S.Ct.* at 862, 63 *L.Ed.*2d at 125–26; *NLRB v. Bell Aerospace Co., supra,* 416 *U.S.* at 288, 94 *S.Ct.* at 1768, 40 *L.Ed.*2d at 150.

As considered by other states in the context of their public sector labor law, "an employee need not participate actively in the formulation or effectuation of management's labor relations policies in order to be deemed 'managerial.'" *Salaried Employees of N. Am. (SENA) v. Illinois Local Labor Relations Bd.,* 202 *Ill.App.*3d 1013, 1020–21, 148 *Ill.Dec.* 329, 335, 560 *N.E.*2d 926, 932 (App.Ct.1990), *appeal denied, AFSCME v. Illinois Local Labor Relations Bd.,* 136 *Ill.*2d 541, 153 *Ill.Dec.* 370, 567 *N.E.*2d 328 (1991). Managerial status is not limited to those at the highest

---

[3] In the private sector, the term "managerial employees" is used. This term is also used in other states' public sector labor laws. We see no particular significance to be drawn from our Legislature's use of the term managerial executive. It is the definition of that term that is critical.

levels of the public employer hierarchy; the "key inquiry is whether the duties and responsibilities of the employees in question are such that the employees should not be placed in a position requiring them to divide their loyalty between the employer and the collective bargaining unit." *Id.* at 1021, 148 *Ill.Dec.* at 335, 560 *N.E.2d* at 932. *See Office of Cook County State's Attorney v. Illinois Local Labor Relations Bd.*, 166 *Ill.*2d 296, 301, 209 *Ill.Dec.* 761, 763, 652 *N.E.2d* 301, 303 (1995) ("[t]he authority to make independent decisions and the consequent alignment of the employee's interests with management's are the hallmarks of managerial status...."); *Chief Judge of Circuit Court of Cook County v. AFSCME*, 229 *Ill.App.*3d 180, 186–87, 171 *Ill.Dec.* 102, 107, 593 *N.E.2d* 922, 927 (App.Ct.), *appeal denied*, 146 *Ill.*2d 624, 176 *Ill.Dec.* 794, 602 *N.E.2d* 448 (1992). *And see Board of Regents of the Regency Univs. Sys. v. Illinois Educ. Labor Relations Bd.*, *supra*, 166 *Ill.App.*3d at 741, 117 *Ill.Dec.* at 806, 520 *N.E.2d* at 1157 (confining the term managerial employee to " 'very limited people ..., at the very highest level' " was not reflective of the traditional interpretation given to the managerial exception); *Fraternal Order of Police, Star Lodge No. 20 v. Pennsylvania Labor Relations Bd.*, 104 *Pa.Commw.* 561, 575–76, 522 *A.2d* 697, 704 (Commw.Ct.1987) ("the mere fact that policy determinations are subject to review by a higher authority does not necessarily negate managerial status"), *aff'd*, 522 *Pa.* 149, 560 *A.2d* 145 (1989); *State v. Local No. 2883*, 463 *A.2d* 186, 190–91 (R.I.1983). *Compare School Comm. of Wellesley v. Labor Relations Comm'n*, 376 *Mass.* 112, 116–117, 379 *N.E.2d* 1077, 1079 (1978) (emphasis added) (where public sector labor law definition of managerial employee included a requirement that such employee "participate to a *substantial degree* in formulating or determining policy," the clear legislative intent was to include only those managers with significant responsibility in the decision-making process).

Following Chapter 303 and despite the broader approach to "management employees" in the private sector and in some other states' public sector laws, PERC adopted a narrow view of the then undefined term "managerial executive." In *City of Eliza-*

*beth,* P.E.R.C. No. 36 at 4 (1970), PERC held that the term applies to an employee "who determines *and* executes policy through subordinates in order to achieve the goals of the administrative unit for which he is responsible or shares responsibility." (Emphasis added). PERC determined that such an employee must have the final responsibility to formulate, determine, and effectuate policy that is essential. *See Bergen County Bd. of Chosen Freeholders of Local Union No. 84,* P.E.R.C. No 69 (1972); *Union County & Union Council No. 8,* P.E.R.C. No. 48 (1970).

The definition proposed by Governor Cahill in vetoing A. 520 was plainly broader and more closely aligned with the private sector definition and with the broader approach taken by some other states in their public sector laws that we have previously referred to. That definition encompassed *those* "who formulate management policies and practices, *and those* who are charged with the responsibility of effectuating and making operative such management policies and practices." (Emphasis added). *Governor's Veto Statement, supra,* A. 520 (1973). Unlike the PERC definition, final responsibility was not critical and the definition encompassed not only involvement in policies, but practices as well. Just as importantly, the definition was in the disjunctive, not the conjunctive, as had been required under PERC's definition. That is, managerial executives could be persons who formulate policies and practices, but also persons who were responsible for effectuating and making operative those policies and practices. One need not do both to qualify.

We recognize that in its final form, the 1974 amendments to Chapter 303 changed Governor Cahill's proposed definition of managerial executive. As *N.J.S.A.* 34:13A–3(f) presently reads, managerial executives are "persons who formulate management policies and practices, and persons who are charged with the responsibility of directing the effectuation of such management policies and practices . . . ." This definition is not limited to high level managers and focuses upon job responsibilities the nature of which would create divided loyalties in the event employees pos-

sessing such responsibilities, and thus are members of the management team, were union members as well. Moreover, we see no discernible difference between the phrase "effectuating and making operative" under Governor Cahill's proposal and the phrase "directing the effectuation of" that the Legislature ultimately used. Directing the effectuation of a policy or practice is, to us, the same as making the policy or practice operative. We are pointed to nothing in the legislative history of the 1974 amendments that would suggest the contrary or that would suggest a more narrow scope. In all other respects, the Legislature adopted Governor Cahill's proposed definition and, most assuredly, his intent was not to draw more narrowly the scope of those managers who would be excluded from the Act but was to fashion a category of managerial executives more closely aligned with the approach taken in the private sector. *See infra* pp. 4–5.

We have no disagreement with PERC's post 1974 assertion that "a person formulates policies when he develops a particular set of objectives designed to further the mission of the government unit and when he selects a course of action from among available alternatives. A person directs the effectuation of policy when he is charged with developing the methods, means, and extent of reaching a policy objective and thus oversees or coordinates policy implementation by line supervisors." *Borough of Montvale,* 6 *NJPER* 507, 508–09 (¶ 11259 1980). To this we would add a reference to practices as well as policies. The plain language of the statute is to that effect. *E.g., In re Jamesburg High School Closing,* 83 *N.J.* 540, 548–49, 416 *A.*2d 896 (1980). PERC's post–1974 amendment consideration of the relative position of the employee in the hierarchy, the functions and responsibilities, and the extent of the discretion the employee possesses, *id.* at 509, reflect, generally, appropriate factors bearing upon proper application of the statutory definition to particular employees. But no support exists in that definition for continuing PERC's prior limitation that a managerial executive "must possess and exercise a level of authority and independent judgment sufficient to affect broadly the organization's purposes or its means of effectuation of

these purposes." *Ibid.* This restriction was a factor considered by PERC in *Bergen Pines County Hosp.,* 8 *NJPER* 535 (¶ 13245 1982), *aff'd,* No. A–564–82T2 (App.Div. Oct. 18, 1983), when it held that positions on the fourth managerial level within the public employer's hierarchy did not "exercise a level of authority and independent judgment sufficient to affect broadly the [public employer's] purposes or its means of effectuating these purposes." *Id.* at 537. Although we affirmed the decision in *Bergen Pines County Hosp.* in an unreported opinion, no issue was raised concerning the validity of PERC's narrow view of the term "managerial executive."

That validity is now raised before us. We think PERC has too narrowly defined managerial executive in light of the statutory definition. It is not only agency heads and their directors, *i.e.,* the top level managers, who can possess the necessary statutory qualities. There is nothing in the definition of managerial executive which excludes middle level managers from its scope if those employees possess the necessary qualities.

Here, PERC acknowledged that at least some of the employees were part of the Authority's policy-making and policy effectuations hierarchy. But it concluded that none exercised "a level of authority and independent judgment sufficient to broadly affect the Authority's purposes or means of effecting these purposes." We read PERC's decision to be premised upon the notion that though the affected employees formulate policy and practices or are responsible for effectuating policies or practices in the areas of their expertise, because they are not placed at the highest hierarchical levels of the organization and do not have wide-ranging powers that extend beyond their own departments, they can not be deemed "managerial executives" under *N.J.S.A.* 34:13A–3(f).

We think this is incorrect. Whether or not an employee is a high level manager and whether or not what he or she does broadly affects the agency are not dispositive. The appropriate factors are those we have previously quoted from *Borough of Montvale, supra,* unhampered by PERC's added requirement that

the employee "possess and exercise a level of authority and independent judgment sufficient to affect broadly the organization's purposes or its means of effectuation of th[o]se purposes." Moreover, as we have said, a managerial executive need not formulate policies and practices *and* be responsible for directing the effectuation of policies and practices. One or the other is sufficient. We also observe that the term "formulate" is not the equivalent of "adopt" and would seem to encompass the responsibility for recommending policies and practices, particularly where the manager's recommendations form a key component of the ultimate determination.

Thus far we have focused upon the statutory definition of managerial executive and PERC's interpretation thereof. As we said at the outset, because we are of the view that this interpretation is inconsistent with the statute and suffers, as well, from an unsupported view that the Legislature intended a narrow approach, the matter must be remanded to PERC for a reconsideration of all of the positions involved. We thus have not evaluated those positions. But we do note that, as PERC and the hearing officer acknowledged, most if not all of these managers are involved in the formulation and/or are responsible for the effectuation of policies and/or practices applicable to their particular areas of responsibilities. A few examples easily illustrate this fact and illustrate, as well, the flaws in PERC's analysis.

Within the Administrative Services and Technology Department, Raniero Travisano, as Administrator of the Offices Services Section, oversees the office and patron services consisting of mail distribution, reception, motor pool, procurement and quality control of all supplies, including toll tickets. Patron services include contracts with Shell Oil and Marriott Corporations. He reports directly to the Director of the department and develops Requests for Price (RFP) for the service area contracts, although the RFP is reviewed by the finance and budget department. The Administrator also recommends the purchase of supplies and consulting services to the Director and those recommendations are usually

followed. He compiles the office/patron services annual budget and discusses it with the Director and those recommendations may include recommendations for promotions. He meets weekly with the Director along with the other managers who are responsible for the divisions that comprise the Administrative Services and Technology Department. They discuss and recommend various policies and practices affecting that department. The Director agrees with 90% of Travisano's recommendations.

Also within the Administrative Services and Technology Department is John Maklary, Manager, Systems & Programming, within the Management Information Systems section. He reports directly to the Director and also attends the Director's weekly staff meetings to update and discuss proposed new methods, procedures or policies. In the Director's absence, Maklary is in charge of the department and attends meetings with the Executive Director of the Authority, who is responsible only to the Board of Commissioners. Although he does not adopt policies on his own, he participates substantially in policy-making. In addition to supervising thirteen employees, he provides cost estimates of negotiations proposals to the Authority's negotiations team before and during negotiations. His input on proposed changes in the existing negotiations agreements is obtained before negotiations begin. Maklary also has responsibility for the design, development and implementation of the Authority's toll collection computer systems, including payroll programming, maintenance systems and toll load systems.

Within the Toll Collection Department, Richard Raymond, Administrative Section Manager, reports directly to the Director of that department. Raymond is the Acting Director and, as such, enforces existing policies in the Director's absence, but does not implement new policies. He coordinates administrative matters among the department sections and between the toll collection department and other Authority departments and is responsible for conveying the Director's policies and practices to other supervisors within the department. He reviews and comments on

department policies and practices and investigates problems reported by the field section managers which he either resolves or discusses with the Director. In resolving such problems, he may clarify or enforce existing policies. The Director accepts Raymond's recommendations 75% of the time. In addition, Raymond compiles the other section managers' negotiations suggestions for the Director, has access to all departmental personnel records and has acted as a hearing officer for disciplinary grievances.

Within the Operations Department, Spencer Purdum, Traffic Engineer, reports directly to the Director of that department and is responsible for all traffic engineering functions of the Authority, including all construction and maintenance activities on the Authority's roadways and implementation of all traffic control devices. In addition, Purdum is responsible for assuring traffic flow in the event of such incidents as motor vehicle accidents, football games at Giants Stadium and fireworks displays at Liberty Park. In doing so, he effectuates major accident response procedures and assures appropriate measures are taken to maintain proper functioning of the Authority's roadways. When a major accident occurs, Purdum has the discretion to call maintenance crews and employees outside of the Operations Department to coordinate the Authority's overall response efforts. Purdum attends monthly staff meetings with the Director where policy issues are discussed. The Director accepts most of Purdum's policy recommendations. In the absence of the Director, he assumes that position and attends Commission meetings of the Authority. Purdum is involved, as well, in formulating the budget and the planning of future requirements for the Department and makes recommendations for collective negotiations proposals.

As to Maklary, the hearing officer concluded, and PERC agreed:

> Maklary develops many of the standards and policies for the MIS section and some of which affect other departments' operations, however, his authority to independently implement policies is circumscribed and, therefore, not managerial. The Commission wrote in *Montvale* that managerial executives must "possess and exercise a level of authority and independent judgment sufficient to broadly affect

the organization's purposes or means of effectuation of these purposes." *Montvale* at 509. Maklary's recommendations must be approved by at least three of management levels, including the commission. Further, his authority to purchase items not included in the annual budget is limited by the finance and budget decisions on spending levels. Finally, his authority to create positions and hire personnel is limited by human resources department procedures, and the personnel committee's authority over staffing levels, promotions, and hiring. Maklary does not meet *Montvale*'s standards for managerial executive status.

Similarly, as to Travisano, the hearing officer recognized that his responsibilities in managing the office/patron services section involves "major support services to the Authority's overall mission, especially to the development of service area contracts, procurement[s] and control of toll tickets, and maintenance of the Authority's motor pool." He also recognized that Travisano makes important recommendations concerning policies and practices which recommendations are frequently adopted. However, neither Travisano nor Maklary were considered management executives because their authority "to implement policies and make decisions is circumscribed by higher levels of approval and procedures designed to insure the integrity of the purchasing function, *i.e.*, bidding procedures." Travisano's authority was found "not sufficiently independent." Similarly, Raymond was not considered a managerial executive because he was not viewed as having independent authority to formulate and implement new policies, was subject to the Director's overriding authority, and possessed no department-wide authority of his own. The hearing officer concluded that his participation "in policy formulation and implementation is too attenuated and circumscribed to qualify as managerial executive duties." And, while recognizing that Purdum "has greater authority and exercises greater discretion," the size or scope of his authority was not "large enough to be considered managerial executive."

We think it fairly plain that when the limitations imposed by PERC upon the scope of a managerial executive, which we consider to be inconsistent with the statutory definition, are removed, the responsibility and duties of these employees would fall within

that definition. But we leave to PERC in the first instance that determination.

### III

"Confidential employees" are defined in *N.J.S.A.* 34:13A-3(g) as:

> [e]mployees whose functional responsibilities or knowledge in connection with the issues involved in the collective negotiations process would make their membership in any appropriate negotiating unit incompatible with their official duties.

In *State of New Jersey,* 11 *NJPER* 507 (¶ 16179), *reconsideration granted in part,* 11 *NJPER* 714 (¶ 16249 1985), *appeal dismissed,* No. A-1375-85T1 (App.Div. Jan. 9, 1987), PERC explained its approach to determining whether an employee is confidential:

> [w]e scrutinize the facts of each case to find for whom each employee works, what he does, and what he knows about collective negotiations issues. Finally, we determine whether the responsibilities or knowledge of each employee would compromise the employer's right to confidentiality concerning the collective negotiations process if the employee was included in a negotiating unit. [*Id.* at 510].

These factors were considered here and, as a general proposition, they are consistent with the statutory definition. But as with the managerial executive classification, the hearing officer, whose findings and conclusions were for the most part adopted by PERC, consistently emphasized two general considerations: 1) that "confidential employee" is given a narrow construction, and 2) that "access to confidential personnel files or information concerning the administrative operations of a public employer" alone is insufficient. *Id.* at 516 n. 3. *Cf. NLRB v. Hendricks County Rural Elec. Membership Corp.,* 454 *U.S.* 170, 178, 102 *S.Ct.* 216, 222, 70 *L.Ed.*2d 323, 331 (1981).

We disagree that the Legislature intended the concept of "confidential employee" to be narrowly applied such that the apparent consequence of that approach is to require actual participation at the negotiations sessions or direct knowledge of the precise proposals and positions to be taken by the Authority thereon. For example, in discussing whether the five field section managers in the Authority's Toll Collection Department were confidential em-

ployees, the hearing officer said "[t]hey are asked to suggest contract changes which may become negotiations proposals but they are not informed which suggestions are used . . . [t]hey are asked to evaluate the effect of union proposals on scheduling and overtime, but this information is ascertainable by the unions." In another instance, when discussing whether John Maklary, Manager, Systems and Programming in the Administrative Services and Technology Department, was a confidential employee, the hearing officer said, "[t]he negotiations team asks Maklary to provide cost estimates of bargaining proposal scenarios before and during collective negotiations . . . However, Maklary is not informed of the significance of these cost scenarios to the Authority's negotiations positions or informed of proposals before their disclosures to the unions." A final example is Richard Raymond, the Administrative Section Manager within the Toll Collection Department. He compiles all of the other section managers' negotiations as to contract changes affecting that department and conveys them to the Director. Because, however, he is not privy to the actual Authority's proposals before they are conveyed to the union, he was not considered a confidential employee but rather only one with "mere access" to the information.

But these employees do not present a "mere access" scenario. They do not merely access information that may play a role in the negotiations process. They assimilate it, evaluate it, analyze it and provide significant information to their supervisors for obvious use in connection with the positions to be taken upon the various issues that arise during the negotiations process. When it is a manager's responsibility to assemble and present to his director department-wide contract changes, or to evaluate the cost of management of various union proposals, we fail to see how that responsibility could not present the specter of divided loyalties were such managers also union members, and, thus, not truly a part of the management team.

This seems to be so whether or not he or she may have access or knowledge of the exact positions the Authority might ultimately

take. That rather restrictive gloss upon the definition of confidential employee simply does not appear in the statute. A member of the management team need not know the exact positions to be taken in order to make his or her union membership incompatible with his or her managerial duties.

The statute refers to responsibilities or knowledge "in connection with the issues involved in the collective negotiations process." Both the term "issues" and the term negotiations "process" certainly connote something more than the actual positions taken by the public employer and the actual across-the-table negotiations sessions. An employee's loyalties can readily be divided without having actual involvement in either. We simply disagree with PERC's view that the definition of "confidential employee" was intended to be as narrow as PERC would suggest. The language of the definition is certainly not narrow and there is nothing in the legislative history that would suggest that such was the intent. *Cf. Wayne Tp. v. AFSCME, Council 52,* 220 *N.J.Super.* 340, 345–46, 532 *A.*2d 255 (App.Div.1987) ("[w]e cannot disregard the innate considerations of self-interest which would tempt a Deputy Clerk [who only had "some potential involvement in the labor relations process," to transmit confidential data, against the interest of the Township ... That [the employee] has never exploited her position in this manner is beside the point. What is crucial is that the access to highly confidential labor relations information of the most sensitive nature provided by the position creates an intolerable presence of conflicting loyalties. In the face of the naturally compelling incentive to help the bargaining unit advance personal interests against those of [the employer], we can only conclude that membership in the bargaining unit is clearly incompatible with the official duties of a Deputy Clerk...."). It seems to us the same could be said, for example, of employees whose responsibilities include evaluating and costing out union proposals. Would not, for instance, the temptation be great to undervalue the union proposals to enhance their acceptance by the Authority? At the very least, such an employee's loyalties would be divided.

Reversed and remanded for further consideration consistent with this opinion.